149 F.3d 1
 49 Fed. R. Evid. Serv. 343
 UNITED STATES of America, Appellee,
v.
Rafael RIVERA-FIGUEROA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
David GARCIA-BELTRAN, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Miguel A. COLLAZO-DIAZ, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Jose Miguel RODRIGUEZ-RODRIGUEZ, Defendant, Appellant.
 Nos. 96-1112, 96-1290, 96-1291 and 96-1292.
 United States Court of Appeals,
First Circuit.
 Heard Jan. 5, 1998.
Decided May 5, 1998.
Rehearing Denied and Suggestion for Rehearing En Banc
Denied in No. 96-1291 Aug. 3, 1998.
 
 Marlene Aponte Cabrera, by appointment of the court, for appellant Rafael Rivera-Figueroa.
 Raymond L. Sanchez-Maceira, by appointment of the court, for appellant David Garcia-Beltran
 Rafael F. Castro Lang, by appointment of the court, for appellant Miguel A. Collazo-Diaz.
 Yolanda C. Romagnolo, by appointment of the court, for appellant Jose Miguel Rodriguez-Rodriguez.
 Mark Irish, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, Nelson Perez-Sosa, Assistant United States Attorney, and Jose A. Quiles-Espinosa, Senior Litigation Counsel, were on brief for the United States.
 Before BOUDIN, Circuit Judge, COFFIN, Senior Circuit Judge, and SHADUR*, Senior District Judge.
 BOUDIN, Circuit Judge.
 
 
 1
 Three appellants were convicted of federal offenses growing out of a 1994 carjacking and murder in Puerto Rico and now appeal their convictions and sentences. A fourth appellant, who pled guilty to a single offense, seeks review of his sentence. We begin with a condensed version of the facts, taken in the light most favorable to the verdict. United States v. Bergodere, 40 F.3d 512, 518 (1st Cir.1994), cert. denied, 514 U.S. 1055, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995).
 
 
 2
 The appellants in this case are David Garcia-Beltran, Rafael Rivera, Miguel Collazo and Jose Rodriguez-Rodriguez.[1] On August 24, 1994, all four gathered at a party at the home of Rivera's ex-wife Karla in Toa Alta, Puerto Rico. Karla was then involved with Abner Polanco. Also present, among others, were Fernando Rodriguez-Reich and Manuel Garcia-Rivera. At some point in the evening, the plan was hatched to murder Polanco; the tangled motives apparently included a quarrel between Karla and Polanco, jealousy on Rivera's part and a desire by some of the others for a "pretty" pistol belonging to Polanco and audio equipment in his car.
 
 
 3
 At Garcia-Beltran's direction, Rodriguez-Reich was sent to take other nonparticipating party-goers home so there would be no witnesses. Thereafter, Garcia-Beltran told other confederates to seize Polanco, and Garcia-Beltran gave a revolver to Collazo. After a struggle, Rivera and Collazo seized Polanco and took away his pistol. The same two men, along with Garcia-Rivera and Rodriguez-Rodriguez, forced Polanco into his own car and took his car keys. They then took Polanco in his car to an isolated area and, at the direction of Collazo, Rivera and Rodriguez-Rodriguez both shot Polanco. All four perpetrators then fled in Polanco's car.
 
 
 4
 Later, Rivera turned over to Garcia-Beltran money that had been taken from Polanco, and Rodriguez-Rodriguez gave Polanco's pistol to Garcia-Beltran. Rodriguez-Rodriguez and Collazo transferred Polanco's audio equipment from Polanco's car to Rodriguez-Reich's car; subsequently at a roadblock, the police apprehended Collazo and Rodriguez-Reich in the latter's car with the audio equipment aboard. The police were aided in their efforts by a so-called dying declaration of Polanco to be later described.
 
 
 5
 On August 31, 1994, a federal grand jury indicted Rodriguez-Reich, Collazo and Garcia-Beltran. A superseding indictment added Rivera, Rodriguez-Rodriguez and Garcia-Rivera. Each defendant was charged in two counts: one for carjacking, 18 U.S.C. § 2119(3), and the other for using and carrying a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c)(1). The indictment charged aiding and abetting in addition to direct participation. 18 U.S.C. § 2(b).
 
 
 6
 In due course, the government secured the cooperation of three of the six--Rodriguez-Reich, Rivera and Garcia-Rivera--and after a plea bargain, each agreed to testify at the trial of the remaining three. Garcia-Beltran, Collazo, and Rodriguez-Rodriguez were tried in October 1995. Each defendant was found guilty on each count, and these three men now appeal. They are joined in the appeal by Rivera, who seeks review only of his sentence.
 
 
 7
 At the threshold of this appeal, the appellants argue that the carjacking statute exceeds Congress's power under the Commerce Clause and is unconstitutional under United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (statute making unlawful the possession of a firearm in a "school zone"). In contrast to the statute involved in Lopez, 18 U.S.C. § 2119 contains an element designed to establish federal power, namely, that the vehicle must have been transported, shipped, or received in interstate or foreign commerce. This is a specific element that must be charged and proved to make the carjacking a crime.
 
 
 8
 The use of motor vehicles to facilitate--indeed to conduct--interstate and foreign commerce is obvious, and Congress's effort to extend protection to the very instruments of interstate and foreign commerce is reasonable on its face and amply supported by precedent. Perez v. United States, 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). At least seven circuits have already upheld the same statute against constitutional challenge,[2] and none has taken the view that the statute is undermined by Lopez. We join in the unanimous opinion of the other circuits.
 
 
 9
 It is quite true that the carjacking statute has become one more device for extending federal jurisdiction over serious crimes that hitherto were by tradition largely left to local authorities and courts; the felon-in-possession statute is an even more dramatic example. 18 U.S.C. § 922(g)(1). But so long as the constitutional nexus exists, as it does here, the choice is essentially one of policy. Whatever the merits of the arguments about federalizing once local crimes, the policy disputes are for Congress to resolve.
 
 
 10
 Turning to the merits, only one of the appellants contests the sufficiency of the evidence. Not surprisingly, the challenge comes from Garcia-Beltran, who did not travel to the site of the execution or participate in the murder. Garcia-Beltran argues that there was insufficient evidence to convict him of carjacking because, while he may have had the intent to kidnap and murder Polanco, there was no evidence that Garcia-Beltran intended to commit carjacking.
 
 
 11
 Although the government does not attempt to answer the argument, there is an answer. The statute provides that it is a crime for someone with the intent to cause death or serious bodily harm, to "take[ ] a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another." At the time of Polanco's murder, the statute further required that this be done while "possessing a firearm" as defined elsewhere in the Criminal Code. A later amendment altering this last quoted phrase is irrelevant to a pre-amendment crime. Pub.L. 103-322, tit. VI, § 60003(a)(14), 108 Stat. 1970.
 
 
 12
 Under this statute, we may assume that a defendant who "takes a motor vehicle" must know what he is doing, and that this knowledge must be possessed by a defendant who merely directs another to act (and so is liable as a principal, 18 U.S.C. § 2(a)) or assists the taker (and is so liable as an aider and abettor, 18 U.S.C. § 2(b)). See United States v. Taylor, 54 F.3d 967, 975 (1st Cir.1995). But nothing in the statute requires that the taking be an ultimate motive of the crime. It is enough that the defendant be aware that the action in which he is engaged, whether by himself or through direction or assistance to another, involves the taking of a motor vehicle.
 
 
 13
 Viewing the evidence in the light most favorable to the verdict, we have no difficulty in finding sufficient evidence of the requisite awareness on Garcia-Beltran's part. Two witnesses testified that Garcia-Beltran ordered the other defendants to take Polanco away and kill him, knowing full well that his confederates would take Polanco's car, and would be carrying, and ultimately using, the gun he gave them. In fact, the confederates initially resisted the order, objecting to Garcia-Beltran that they did not want to be involved in carjacking.
 
 
 14
 We turn now to alleged trial errors. The most complicated claim stems from a declaration made by Polanco after the shooting. Although shot in the chest, he was able to make a statement to the police before he died. In the statement, he said--according to the police sergeant's later report to the FBI--that he had been kidnapped by someone whom he described in terms that pointed to Garcia-Beltran and that there were three other persons involved. He gave some identifying information, although not the proper names, as to two of the three other individuals and said that the last he knew by sight only.
 
 
 15
 In the government's view, the information given by Polanco implicated Garcia-Beltran, Collazo and Rodriguez-Reich. However, the eyewitness evidence of the government's cooperating witnesses makes clear that Garcia-Beltran and Rodriguez-Reich were not part of the group that drove away with Polanco and later shot him. When the implicated appellants moved to suppress the declaration, the government defended its admissibility as a dying declaration, but the district court suppressed the statement, saying that it was "inaccurate. It's full of riddles. It's full of questions. It's contradicted."
 
 
 16
 The first claim on appeal arising out of the suppression of Polanco's statement is that of Rodriguez-Rodriguez. He argues that the alleged dying declaration should have been admitted as exculpatory evidence since Polanco did not name Rodriguez-Rodriguez. The government contends that this claim was waived because it was not raised at the suppression hearing. It also argues that the dying declaration rule applies by its terms only to a prosecution for "homicide," Fed.R.Evid. 804(b)(2), and therefore not to a "carjacking" even if a death is involved.
 
 
 17
 Bypassing both issues for a moment, we agree with Rodriguez-Rodriguez that the district court cannot exclude a dying declaration merely because the judge thinks that it is unreliable. In context, the district judge's remarks come close to being--and may even have been intended as--a ruling under Fed.R.Evid. 403 that the probative value of the evidence was substantially outweighed by its capacity for unfair prejudice or for misleading the jury. But the judge's remarks were directed against the use of the declaration to inculpate two of the appellants; the calculus would be different if the declaration were used only to exculpate--although that would have almost certainly required a severance.
 
 
 18
 The difficulty is that there was no objection from Rodriguez-Rodriguez when the other defendants pursued their motion to suppress in the district court.[3] Had the objection been timely made, the court would have been confronted with a different set of arguments for admissibility, a conflict in position among the co-defendants, and the possibility of a severance if the court agreed that the evidence should be admitted as to one co-defendant but excluded as to the others. This was the occasion for Rodriguez-Rodriguez to object to the suppression motion, and yet no such objection was made until six months later, when Rodriguez-Rodriguez first moved for a severance so that the declaration would be admitted.[4]
 
 
 19
 A motion to suppress evidence effectively advances the time at which a party who wants that evidence admitted has to argue for that result. Although it may be easier to revisit such rulings than ones made in the course of the trial, rulings in limine are relied upon by the court and the parties in preparing for trial. The failure to object to a suppression motion is as much a waiver as any other failure to object, subject always to the right of a party who waived an objection to argue on appeal for plain error review. Fed.R.Evid. 103(d); United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).
 
 
 20
 Under the plain error standard, it is necessary to show not only that the exclusion of evidence was error--which we will assume purely arguendo--but also that there is a substantial likelihood that the admission of the evidence would have led to a different result. Olano, 507 U.S. at 734-35, 113 S.Ct. 1770 ("must have affected the outcome"). But Polanco's dying declaration did not say that the persons he "named" were the only ones involved; on the contrary, he said that there was a fourth person whom he could not identify. Without a showing that Polanco knew Rodriguez-Rodriguez well enough to name him, the dying declaration had limited tendency to exculpate Rodriguez-Rodriguez; and in view of the direct testimony against him by co-defendants, we cannot find it likely that admitting the dying declaration would have led to an acquittal.
 
 
 21
 Collazo has a different argument relating to the dying declaration. He asserts that the declaration was properly excluded by the district judge but was then effectively introduced by prosecution testimony through the back door. The testimony was that of a police officer who said, in direct examination, referring directly to Collazo by a nickname:
 
 
 22
 The cream-colored Toyota went past with his [sic] windows down. Three individuals were in it. I was able to recognize one of them as one of the persons who had been named as having to do with the case, and I told the sergeant: "It's them. There goes Guelito [the nickname of Collazo]."
 
 
 23
 It is quite true that the police were looking for Collazo and several others immediately after the shooting because they were identified at least by nicknames or other indicia in Polanco's dying declaration, but the trial testimony made no mention of the declaration. Only a clairvoyant juror could have guessed at its existence. All that the jurors learned was that for some unknown reason, the police were seeking Collazo in connection with the case.
 
 
 24
 Of course, in many contexts, it might be error to tell the jury that the police had unknown information connecting defendant to the crime. But the glancing reference in this case does not approach the force of a dying declaration actually naming the defendant. Further, any mischief worked by this comment was dwarfed by the eyewitness testimony of collaborators linking Collazo to the crime and by other evidence, including proof that Collazo was arrested shortly after the murder in a car filled with audio equipment stolen from Polanco's car.
 
 
 25
 The last issue that warrants separate discussion is a claim of Garcia-Beltran involving jury instructions. On the last day of trial, Garcia-Beltran asked that the jury be instructed on the elements of the crime of being an accessory after the fact. 18 U.S.C. § 3. The district judge rejected the request on the ground that while the evidence permitted the jury to find that Garcia-Beltran was a full participant in a carjacking, there was no record basis for the accessory-after-the-fact theory. Garcia-Beltran renewed his objection after the charge was given and now claims error.
 
 
 26
 It might not have been literally impossible for a rational jury to acquit Garcia-Beltran of carjacking but still to find that he was an accessory after the fact. There was testimony from one witness that Garcia-Beltran was asleep at the time that the carjacking plan was adopted but that he did participate in post-crime activities that might have been characterized as concealing the crime or hindering the investigation. In theory, but only in theory, a jury might have accepted this testimony, while disbelieving the far more substantial testimony as to Garcia-Beltran's central role in the crime.
 
 
 27
 However, even on this premise, the legal basis for the instruction is thin. A defendant is ordinarily entitled to a lesser-included-offense charge, if consistent with the evidence. Schmuck v. United States, 489 U.S. 705, 715-16 & n. 8, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989); see also Fed.R.Crim.P. 31(c). For obvious reasons, it is often to the defendant's advantage to request such a charge. But using the "elements" test adopted by the Supreme Court in Schmuck, 489 U.S. at 716, 109 S.Ct. 1443, an accessory-after-the-fact offense is almost never going to be a lesser included offense as to the principal crime.[5]
 
 
 28
 The Ninth Circuit has assumed in a passing dictum that an accessory-after-the-fact charge could be required at the defendant's behest as a lesser-included-offense instruction, United States v. Dinkane, 17 F.3d 1192, 1200 (9th Cir.1994), but the court's brief discussion overlooks the Supreme Court's "elements" approach. A more defensible precedent from Garcia-Beltran's standpoint is United States v. Brown, 33 F.3d 1002, 1003-04 (8th Cir.1994). There, the Eighth Circuit held that where justified by the evidence, an accessory-after-the-fact instruction might have to be given as a form of "defense."
 
 
 29
 The Eighth Circuit's approach appears to us liable to mislead the jury. A charge normally tells the jury that each element of the charged offense must be proved. To give the jury an additional set of elements for an uncharged crime that is not a lesser included offense, and of which the defendant seemingly cannot be convicted, seems to us a recipe for confusion. Where appropriate, the court can properly explain to the jury that the defendant's theory of the case is that he merely assisted in covering up the crime but did not participate in its commission. This achieves the Eighth Circuit's purpose without the same risk of confusion.
 
 
 30
 In all events, in this case the Eighth Circuit's instruction--or the Ninth Circuit's for that matter--would not have altered the result. The evidence that Garcia-Beltran was an accessory after the fact was quite limited, but the evidence of his complicity in the carjacking itself was overwhelming, once the jury decided (as it clearly did) to credit the eyewitness testimony of the confederates who testified at trial. If it was error to omit the accessory-after-the-fact instruction, which we do not think it was, it certainly was harmless error.
 
 
 31
 About a dozen additional claims have been made by the four appellants, including objections to the voir dire, alleged prosecutorial misconduct, refusal to replace appointed counsel, admission of threats, failure of the judge to depart downward in sentencing and similar matters. We have reviewed each of these charges. While a number of them are legitimately raised, they are adequately answered in the government's brief or otherwise present no issue that needs substantial discussion.
 
 
 32
 Accordingly, the convictions and, to the extent challenged, the sentences imposed are affirmed.
 
 
 
 *
 Of the Northern District of Illinois, sitting by designation
 
 
 [1]
 Most of the persons named are identified by the first of their two family names; but both family names are used where confusion in names would otherwise result
 
 
 [2]
 United States v. Romero, 122 F.3d 1334, 1339 (10th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 1310, 140 L.Ed.2d 474 (1998); United States v. Hicks, 103 F.3d 837, 848 (9th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1483, 137 L.Ed.2d 694 (1997); United States v. McHenry, 97 F.3d 125, 126-29 (6th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 992, 136 L.Ed.2d 873 (1997); United States v. Coleman, 78 F.3d 154, 157-60 (5th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996); United States v. Hutchinson, 75 F.3d 626, 627 (11th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 241, 136 L.Ed.2d 170 (1996); United States v. Bishop, 66 F.3d 569, 576-83 (3d Cir.), cert. denied, 516 U.S. 1032, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995); United States v. Robinson, 62 F.3d 234, 236-37 (8th Cir.1995)
 
 
 [3]
 Counsel for Rodriguez-Rodriguez says in his brief that he did not "participate" in the suppression hearing, but the transcript shows that counsel for Rodriguez-Rodriguez was present at the hearing and raised no objection to the suppression motion
 
 
 [4]
 While the objection to exclusion of the exculpatory statement should have been made at this time because the issue had been presented by the suppression motion, Rodriguez-Rodriguez was free to delay making his severance motion. Cf. Fed. R. Crim. P. 12. However, since he knew of the suppression ruling well before trial, he could hardly expect the trial judge to look sympathetically at a severance motion made on the eve of trial
 
 
 [5]
 The accessory-after-the-fact offense does have some elements in common with the principal crime insofar as it requires proof of the substantive offense by someone; and it is certainly a lesser offense carrying a lesser penalty. 18 U.S.C. § 3. But the accessory offense is not a lesser included offense because it requires proof that the principal offense does not, namely, that the defendant assisted after the principal crime was committed