Commonwealth vs. Jessica Deane.

Suffolk. April 8, 2010. - September 20, 2010.

Present: Marshall, C.J., Ireland, Spina, Cordy, & Botsford, JJ.

*Homicide. Joint Enterprise. Evidence,* Joint venturer, Telephone conversation. *Telephone. Practice, Criminal,* Capital case, Argument by prosecutor, Instructions to jury. *Accessory and Principal.*

At the trial of indictments charging the defendant with murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty, the evidence was sufficient to permit the jury to find the defendant guilty as a joint venturer, where the jury reasonably could have inferred that the defendant was present at the victims' killings and that she willingly aided in the murders. [50-52]

At a criminal trial, the judge did not err in admitting in evidence, over objection and with a limiting instruction, excerpts from telephone conversations that the defendant had with two others while she was in jail awaiting trial, where statements in which the defendant denied animosity toward the victims were exculpatory, and where other statements were properly admitted as consciousness of guilt. [53-55]

In closing argument at a murder trial, the prosecutor did not misstate evidence in violation of the defendant's due process rights and her right to a fair trial, but rather argued a proper inference from the defendant's statement to police; moreover, even if the prosecutor's argument were improper, no substantial likelihood of a miscarriage of justice arose, given that the defense relied on that statement. [55-56]

The judge at a murder trial did not err in instructing the jury on joint venture, where the instruction made clear that the defendant could not be found guilty of murder if her only participation consisted of helping to dispose of the body of one of the victims; moreover, the judge did not abuse his discretion in declining, over objection, to instruct the jury in distinguishing accessory after the fact from joint venture. [56-60]

Indictments found and returned in the Superior Court Department on August 20, 2004.

The cases were tried before *Patrick F. Brady,* J.

*Chauncey B. Wood* for the defendant.

*Anna E. Kalluri,* Assistant District Attorney (*Patrick Haggan,* Assistant District Attorney, with her) for the Commonwealth.

Ireland, J. In 2007, a Superior Court jury found the defend-

ant, Jessica Deane, guilty as a joint venturer[1] of the murders in the first degree of Kayla Ravenell (Ravenell) and her twenty-seven month old son (child), on the theories of deliberate premeditation and extreme atrocity or cruelty. She appealed and now claims that the trial judge committed reversible error in denying her motion for required findings of not guilty, in admitting recordings of her telephone calls from jail, and in denying her request for a jury instruction distinguishing accessory after the fact from joint venture, as well as error in instructing the jury on joint venture. She also claims reversible error in the prosecutor's closing argument. Because we conclude that there was no error requiring reversal and our review of the entire record provides no basis to grant relief under G. L. c. 278, § 33E, we affirm the defendant's convictions.

*Facts.* We summarize the evidence at trial, in the light most favorable to the Commonwealth, focusing on evidence relevant to the defendant's attack on the sufficiency of the Commonwealth's case and reserving certain details for our discussion.

1. *Background.* Jims Beneche was the former boy friend of Ravenell and the father of her son, who was born in February, 2002.[2] The relationship between Ravenell and Beneche deteriorated near the end of 2003. There was testimony that Beneche was ordered to pay child support of fifty-seven dollars per month.[3]

The defendant, who lived in Brockton, started dating Beneche in 2003. In the spring of 2004, she began staying with Beneche, who lived with his mother and a brother in an apartment in the East Boston section of Boston. Beneche did not have a driver's license, and whenever the defendant was with Beneche in a vehicle, she was driving.

The defendant hated Ravenell and her son, and she told numerous friends and acquaintances that she wished they were dead.

---

[1] In this case, which was tried before we issued our opinion in *Commonwealth v. Zanetti*, 454 Mass. 449 (2009), the jury were asked whether the defendant was guilty as a principal or as a joint venturer.

[2] At a separate trial, Jims Beneche also was convicted as a joint venturer of murder in the first degree of the two victims on the theories of deliberate premeditation and extreme atrocity or cruelty. We have affirmed his convictions. See *Commonwealth* v. *Beneche, post* 61 (2010).

[3] We note that, as set forth in *Commonwealth* v. *Beneche, supra* at 64, at Beneche's trial this amount was stated to be fifty-seven dollars per week.

She told Beneche's mother that she hated the child. At various times, she also said that she was going to "beat . . . up" and "fuck up" Ravenell, and that she would kill Ravenell. The defendant told several friends that she did not want Beneche to pay child support and that she did not believe that the child was his son. She stated that she "did not want to pay a dime to that bitch and that baby,"[4] and "I'll make sure [Ravenell] and that kid's dead." She wanted Beneche to take a paternity test. Whenever Beneche visited with his son and Ravenell, the defendant would harass them by repeatedly telephoning the victim or Beneche. The telephone calls were so harassing that Ravenell and Beneche's mother had their telephone numbers changed. The defendant also telephoned the Department of Social Services to report, anonymously and falsely, that the child looked sick and that Ravenell was hitting him.

In addition, the defendant hated the child because she wanted to have Beneche's first child. In the spring of 2004, she and Beneche told various people they were either married or engaged. The defendant told others that she was pregnant by Beneche. On Mother's Day, 2004, the child was hospitalized. Beneche went to the hospital to visit him. The defendant was angry and said that she wished the child would die and that she would get Ravenell and the child out of Beneche's life.

Several writings by the defendant were introduced at trial. In a letter to Beneche she wrote: "I love you. I'm willing to die for you. I would do anything for you no matter if it was to kill someone for you. I would still do it just because you asked me to." In an unsent letter addressed to one of her friends, the defendant wrote, in part:

> "Oh, yeah, girl, I need you because it's time. I'm doing that shit with that bitch. I'm plottin' everything right now so that ain't no one gets caught up. This bitch is done for finally. I know you got my back. I know there ain't no one fuckin' with you cause I'll kick their fuckin' ass. Ain't no one fuck with my road dog."

Moreover, the defendant told one of her friends that she would kill for Beneche.

---

[4]The defendant commonly referred to Ravenell as "bitch."

2. *The murders.* The victims were killed on the night of May 22, 2004. At approximately 11 P.M., Ravenell and her son left their apartment and went to Beneche's apartment, ostensibly for Ravenell and Beneche to discuss their child support issues. Ravenell was driving her mother's 1996 Chevrolet Corsica automobile. The defendant was with Beneche; Beneche's mother and brother were away overnight.

At the apartment, Ravenell and the child were beaten and suffocated. The child's body was placed in a bag that had household trash in it. Ravenell's body was placed in some black trash bags and a coaxial cable was wound around the bags.

At approximately 2 A.M. on May 23, a neighbor saw the defendant and Beneche struggling to get a trash bag, which police later learned contained Ravenell's body, down the stairs of the apartment building; the two were dragging and kicking it because they could not lift it. The pair placed the bag in the trunk of Ravenell's car. The defendant then drove the car to the Great Pond Reservoir in Braintree, an area familiar to her. She and Beneche dumped Ravenell's body in the pond, where it was discovered the afternoon of May 23 by an off-duty State trooper who had been walking near the pond with his sons.

After they left the reservoir, the pair proceeded to Brockton to a hospital emergency room because Beneche had a cut on his finger. They arrived at approximately 6 A.M. on May 23. The hospital security camera photographed them; at one point, they were holding hands. At approximately 9 A.M., the couple left the hospital and drove to some woods, near an industrial area with which the defendant was familiar, where they left Ravenell's car. They made their way to the defendant's mother's house. The defendant asked her mother for some money for train fare back to Boston.

Before they left Brockton, the pair went to a coffee shop. The owner, who was friendly with the defendant, noticed that the defendant was smiling and seemed happy, whereas Beneche seemed sad. Others who spoke to or saw the defendant on that day also testified that there was nothing out of the ordinary in her behavior or demeanor.

Ultimately, the defendant and Beneche went back to Beneche's apartment. Police, who had been investigating Ravenell's murder, arrived at approximately 2 A.M. on May 24, looking for the

child. Beneche's mother let them in. They asked for Beneche, and the mother indicated that his bedroom was upstairs. On the approach of the police, the trash bag containing the child's body was thrown out Beneche's bedroom window. A police officer, who had positioned himself in a parking area directly below the window, heard a sound "like plastic fluttering." When he turned toward the sound he saw a plastic trash bag hitting the pavement.

When police officers went into the bedroom, the defendant and Beneche pretended to be asleep. The officers separated the pair for questioning; as discussed below, the defendant gave three different statements to police.

3. *Evidence.* The medical examiner who conducted Ravenell's autopsy reported that she had a laceration above her right eye caused by blunt force trauma, as well as a broken tooth socket that was consistent with blunt force trauma. She had four other points of blunt force trauma to her head, as well as bruises inside her mouth adjacent to her jaw that were consistent with blunt force trauma to both sides of her mouth. At least some of the wounds on her head were consistent with a shod foot. She also had bleeding in both eyes, consistent with suffocation, and injuries to her lips consistent with something being held over her nose and mouth or placed over her head. He testified that while she was being suffocated, Ravenell would have struggled for air for twenty to thirty seconds, and death could have taken as long as six minutes. Her cause of death was asphyxia due to suffocation.

The medical examiner who conducted the child's autopsy testified that he suffered several abrasions or bruises to his head, face, and under the surface of his upper and lower lips. The bone behind his left eye was fractured consistent with blunt force trauma to the eye. His brain was swollen, which was consistent with head trauma and indicated that he was still alive when he received his head and eye injuries. His eyes and larynx had injuries consistent with neck compression. The blunt force trauma to his head alone could have been fatal. He also was suffocated by having his mouth and nose compressed, and there were bruises under his chin the size of fingertips. It would have taken him ninety seconds before he lost consciousness, and death would have occurred within five to six minutes. His cause of death was head trauma and suffocation.

There was physical evidence tying the defendant to the killings. Testing of a mixture of blood on Timberland brand work boots the defendant had been wearing revealed that Ravenell could not be excluded or included as a source of that blood. In her statement to police, discussed *infra*, the defendant stated that the blood belonged to Ravenell, or Beneche, or both. Ravenell's blood was on the inside left sleeve and inside front of the sweatshirt the defendant had been wearing at the time of the killings. The defendant's fingerprints were found in three places on the exterior of the bag that held the child's body, and two hairs that matched the defendant's were found inside the bag, one of which was on the back of the child's head.[5] The defendant had scratches and bruises on her arms.

4. *The defendant's statements.* The defendant gave three statements to police. At the apartment, she was advised of her Miranda rights twice before she gave a statement in which she first denied any knowledge of the homicides but, when pressed, stated that Beneche had invited Ravenell to meet with him to discuss child support payments and that she had waited outside in a park that was close to the apartment (first statement).

Police transported the defendant to the Boston police headquarters, where she was again advised of her Miranda rights and interviewed. The first part of her story was essentially the same as the first statement, i.e., that she waited in a nearby park. She stated that Beneche picked her up at the park at about 4:30 A.M., some four to five hours after she had left the apartment. He told her that he had taken Ravenell and the child home and said that he cut his finger and needed to go to the hospital. According to this version, at approximately 3:30 P.M. the next day, Beneche told the defendant that he had smothered the victims and dumped them in the harbor by his house (second statement).

After a detective told her that he did not believe her, the defendant gave a third statement that was tape recorded. Her story was essentially the same until the point where Beneche

---

[5]Both hairs were similar in color, length, and thickness to the defendant's hair. A mitochondrial deoxyribonucleic acid (DNA) test on the hair found on the child's head matched that of the defendant. This particular DNA sequence was "a rather rare profile."

came to pick her up at the park. In sum, she now claimed that Beneche told her he needed her help. She went back to the apartment with him. When she arrived, Ravenell's body was already wrapped in a bag with the wire wrapped around it. Beneche said that he smothered Ravenell and "slammed her head off the floor" approximately ten times. Beneche threatened to kill the defendant if she did not help him. In addition, during the entire time she helped him, Beneche repeatedly stated that if the defendant told anyone, he would kill her. She asked where the child was and the defendant told her not to worry. She helped the defendant drag Ravenell's body outside and place it in the trunk of Ravenell's car. Beneche forced the defendant into the car. Beneche drove to dispose of Ravenell's body, to the hospital, and to the defendant's mother's house in Brockton. She also claimed that she did not know where Beneche dumped Ravenell's car once the pair arrived at her mother's house. She stated that the injuries to her arms were inflicted by Beneche.

The defendant further stated that, when they returned to Beneche's apartment, she took off her clothes and her boots. When police arrived at the apartment, Beneche went to the closet, grabbed a trash bag, and threw it out the window. She did not know it contained the child's battered body until it was recovered by police.

5. *The defense.* The defendant called no witnesses at trial and she did not testify. The defense, in essence, was that Beneche was the murderer and that any evidence tying the defendant to the murders was consistent with her third statement that she helped Beneche after the murders. Through cross-examination of the Commonwealth's witnesses, defense counsel also argued that the police investigation was faulty. Moreover, he argued that there was an innocent explanation for the hair and fingerprints that were recovered from the bag with the child's body. He elicited from the Commonwealth's crime scene analyst that, although it was not probable, it was possible that the defendant's hair could have been in the trash bag because she lived in the apartment and that a hair in the bag possibly could have transferred to the child's head. A witness also testified that the defendant handled trash while she lived with Beneche. Defense counsel asserted that it was in this way that the defendant's fingerprints came to be on the outside of the bag.

*Discussion.* 1. *Sufficiency of the evidence.* The defendant claims that the judge erred in denying her motion and renewed motion for required findings of not guilty on the ground that there was insufficient evidence that the defendant was guilty as a joint venturer. "We review the denial of a motion for a required finding of not guilty to determine 'whether the evidence viewed in the light most favorable to the Commonwealth could have "satisfied a rational trier of fact" of each element of the crimes charged beyond a reasonable doubt.' *Commonwealth* v. *Conkey*, 443 Mass. 60, 72 (2004), quoting *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). Where the evidence is largely circumstantial, it is not essential that the inferences drawn should be the only necessary inferences. It is enough that the inferences 'be reasonable and possible.' *Commonwealth* v. *Conkey, supra,* quoting *Commonwealth* v. *Lodge*, 431 Mass. 461, 465 (2000). If conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies.' *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981), quoting *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978)." *Commonwealth* v. *Garuti*, 454 Mass. 48, 54-55 (2009).

A defendant is guilty as a joint venturer "if the Commonwealth has proved beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense." *Commonwealth* v. *Zanetti*, 454 Mass. 449, 454, 468 (2009). See *Commonwealth* v. *Semedo*, 422 Mass. 716, 720-721 (1996) (in joint venture, defendant responsible for conduct of coventurers). The critical question with respect to whether the evidence was sufficient to warrant a finding that a defendant is guilty of murder in the first degree as a joint venturer on the theories of deliberate premeditation and extreme atrocity or cruelty is whether the defendant was present at the scene of the murder, with the knowledge that another intends to commit a crime or with intent to commit the crime and by agreement was willing and available to assist if necessary. *Commonwealth* v. *Phillips*, 452 Mass. 617, 633 (2008). Mere presence is insufficient to establish joint venture liability. *Id.* However, the Commonwealth is not required to prove exactly how a joint venturer participated in the murders, *id.* at 634, or which of the two did the actual

killing. *Commonwealth* v. *Echavarria*, 428 Mass. 593, 598 (1998). Here, the Commonwealth was required to prove that the defendant shared the requisite malice, that is, a specific intent to kill, and that the murders were committed in a manner that showed extreme atrocity or cruelty and deliberate premeditation. *Commonwealth* v. *Phillips*, *supra* at 633. *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983) (factors to consider in determining extreme atrocity or cruelty).

The defendant concedes, and we agree, that the Commonwealth proved that she had what she calls "motive" (intent) to kill the victims. Several people testified to her hatred of the victims and that she wanted them to die, and she wrote letters stating she was actively "plotting" Ravenell's death and she would kill if Beneche asked her to. The defendant contends, however, that there was no evidence that she "was present for the killings, participated in any way or did anything to make them succeed." In short, the defendant argues that the evidence may have supported a finding only that she was an accessory after the fact. To support this argument, the defendant points to evidence that she claims could not sustain a guilty verdict: the defendant's blood was not found anywhere, and the presence of the defendant's hair and fingerprints on the bag containing the child's body is consistent only with concealing his body. She argues, alternatively, that even if this evidence established her presence at the killings, it is insufficient to prove she participated in the killings. We disagree.

The jury reasonably could have inferred that the defendant was present at the killings. The jury could have believed that when the defendant was seen by a neighbor helping Beneche bring the bag which, it was later established, had Ravenell's body in it, down the stairs of the apartment building, it was approximately 2 A.M. It was reasonable for the jury to infer that if the defendant was helping Beneche at 2 A.M., she had been in the apartment at the time the victims were killed and not at the park as she claimed.

The jury also could have inferred that the defendant aided in the murders. Ravenell's blood was on the inside of the defendant's sweatshirt. At least some of the wounds to Ravenell's head were consistent with a shod foot and Ravenell's blood could not be excluded from the blood on the defendant's boot.

From the medical examiner's testimony that Ravenell was struck on multiple sides of her head, and that she would have struggled for air while being suffocated, the jury could have inferred that more than one person was involved in the killing. Moreover, the defendant's hair was on the child's head and in the bag that contained his body, and her fingerprints were on the outside of that bag. Based on the evidence of the pair holding hands at the hospital and the defendant's behaving "normal[ly]" and seeming happy the morning of May 23, the jury also could have determined that she was a willing participant in the killings. They could have inferred that the scratches and bruises on the defendant's arms also were due to her participation in the killings. They could have viewed her varying versions of what happened as her attempt to cover her involvement. See *Commonwealth* v. *Basch*, 386 Mass. 620, 624 (1982) (lying to police evidence of consciousness of guilt).

There was sufficient evidence to find the defendant guilty of the murders as a joint venturer. Moreover, the manner in which the victims were killed, suffocated and beaten, supports the convictions of murder in the first degree by deliberate premeditation and by extreme atrocity or cruelty. See *Commonwealth* v. *Semedo*, *supra* (in joint venture, one is responsible for conduct of coventurers).

The defendant attempts to avoid the reasonable inferences the evidence permitted by arguing that findings of not guilty are required because where there is evidence that "tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof." *Berry* v. *Commonwealth*, 393 Mass. 793, 796 (1985). The defendant's reliance on this principle fails because it is predicated on the assumption that the jury were required to believe the defendant's third statement to police. Credibility determinations are the province of the jury, and as recounted above, there was sufficient evidence to support the jury's rejection of the defendant's version of events. *Commonwealth* v. *Lynch*, 428 Mass. 617, 622 (1999), quoting *Commonwealth* v. *Bennett*, 424 Mass. 64, 68 (1997) (defendant's interpretation of events is not only reasonable one; jury determine where truth lies). The judge did not err in denying the defendant's motions for required findings of not guilty.

2. *Defendant's jailhouse telephone call recordings.* Excerpts from telephone conversations that the defendant had with one of her friends (and the friend's boy friend) while the defendant was in jail awaiting trial were admitted at trial, over defense objection.[6] The defendant had filed a motion in limine and objected to their admission on the grounds that they violated the defendant's due process, self-incrimination, and confrontational rights, and that the statements the friend and boy friend made during their conversations with the defendant were hearsay. The motion was denied. Defense counsel objected at trial when the recordings were about to be played for the jury, again arguing that statements made by the friend and her boy friend were hearsay. The judge overruled the objection but gave a limiting instruction concerning the hearsay statements.[7]

In the conversations, the defendant denied any knowledge of the murders until the police arrived at Beneche's apartment, and further denied that she was present when Beneche disposed of Ravenell's body; that Beneche went with her to her mother's home in Brockton; and that she had animosity toward Ravenell. She claimed that if a paternity test showed that Beneche was

---

[6]The friend testified at trial that she knew her conversations were being recorded. The defendant also admits knowledge that the conversations were being recorded.

[7]The judge instructed the jury as follows:

"[W]e're going to . . . hear portions of conversations that allegedly the defendant had with this witness. . . . I know that [there is] a conversation where the witness says something . . . her boy friend . . . says something, and the defendant says something. That is the allegation. What I'm admitting for your consideration . . . is the out-of-court statements allegedly made by the defendant. . . . [I]t's a three-way conversation at least in part, the statements made by the other people . . . are not being admitted for your consideration. Why are you hearing [them]? Because to understand what the defendant said, you have to have heard what the other people in the conversation said. . . . [T]here are various factual assertions made by these other parties to the conversation that are untrue, that are false or that are speculative. And counsel . . . informed me as to at least one statement having to do with fingerprints on a motor vehicle which is not true. . . . I want you to be very clear that when you hear the conversation, what is being admitted . . . is any statements that you believe the defendant . . . made in the . . . conversations . . . . But what the other person said, that is not being admitted for your consideration [but] only being played so that you can understand what it was that the defendant said."

the child's father, they would take custody of him, and stated, "I really want to take care of that little boy." She also stated that she was kidnapped, a victim, and that Beneche stabbed her with a knife.

For the first time on appeal, the defendant makes a somewhat convoluted argument that the introduction of the tape recordings violated her right to privacy and constituted an unreasonable search under the Fourth Amendment to the United States Constitution.[8] We do not review claims where the defendant raises grounds other than the grounds she raised below, except to determine whether there was a substantial likelihood of a miscarriage of justice.[9] *Commonwealth* v. *Fowler*, 431 Mass. 30, 40-42 & n.20 (2000), and cases cited (where defendant claimed witness statement and closing argument violated right to remain silent but at trial did not object to witness statement on that ground and did not object at all to closing argument, court reviewed errors under substantial likelihood of miscarriage of justice standard).

It is clear that the judge was cognizant of the potential prejudice the admission of the hearsay statements would present because he gave a limiting instruction. See note 7, *supra.* This was an appropriate way to deal with the hearsay issues. Concerning the defendant's own statements, we conclude that there was no error in the admission of her statements where she denied animosity toward Ravenell and the child. The Commonwealth introduced the statements to show consciousness of guilt. In any event, the statements directly contradicted the trial testimony of several witnesses and were exculpatory. Concerning her other statements that contradicted her third statement to police, the statements were properly admitted as consciousness of guilt. *Commonwealth* v. *Morales*, 440 Mass. 536, 547 (2003), citing *Commonwealth* v.

---

[8] The defendant asserts an unreasonable search argument under her claim that her expectation of privacy was objectively reasonable. The defendant also acknowledges that in *Matter of a Grand Jury Subpoena*, 454 Mass. 685, 688-689 (2009), this court decided that a pretrial detainee's conversations may be turned over to prosecutors. She states that she is raising the privacy issue on Federal constitutional grounds "to preserve it for presentation to the United States Supreme Court."

[9] On appeal, the defendant does not raise the other grounds on which she objected to the admission of the recording at trial.

*Fernandes*, 427 Mass. 90, 93-94 (1998).[10] In addition, given the judge's instruction on murder, which we assume the jury followed, the jury could not have found the defendant guilty based solely on her denial of involvement in the crimes. *Commonwealth v. Cruz*, 416 Mass. 27, 32-33 (1993).

3. *Prosecutor's closing.* In her third statement to police, the defendant had the following exchange with a detective concerning her Timberland boots:

THE DETECTIVE:  "And what did you do with the Timberland boots?"

THE DEFENDANT:  "I put them on the floor and then [Beneche] threw them in the closet."

THE DETECTIVE:  "Why did he do that?"

THE DEFENDANT:  "Because I had some of her blood on me from when he rolled [Ravenell] over."

THE DETECTIVE:  "Are you sure it was her blood?"

THE DEFENDANT:  "It was either hers or his. I just didn't want to have blood on my Timberlands."

In his closing argument, the prosecutor stated, "[T]he shoe . . . which clearly are women's shoes, you will have them in the jury room, have blood all over the front, blood that [the defendant] admits is Ravenell's." There was no objection to this statement.

The defendant argues that the prosecutor misstated the evidence in violation of the defendant's due process rights and her right to a fair trial. She argues that the error warrants reversal of her convictions because the statement did not involve a collateral issue, the judge did not issue a curative instruction (where there was no objection), and the comment would have made a difference in the jury's consideration of a "close case."

A "prosecutor is entitled to argue the evidence and fair infer-

[10]In her request for jury instructions, the defendant requested that a consciousness of guilt instruction not be given, and the judge did not instruct the jury on consciousness of guilt. See *Commonwealth v. Cruz*, 416 Mass. 27, 29-30, 33 (1993) (defendant may request that judge not instruct on consciousness of guilt).

ences to be drawn therefrom." *Commonwealth* v. *Paradise*, 405 Mass. 141, 152 (1989). We conclude that this was a proper inference from the defendant's qualified statement that it was Ravenell's blood, and where, as discussed, the blood analysis showed that Ravenell could not be excluded as a source of the blood on the boots. Moreover, even if this statement were improper, there could be no substantial likelihood of a miscarriage of justice where the defense relied on the defendant's third statement that she was forced to assist Beneche in disposing of Ravenell's body. Ravenell's blood on the boots is entirely consistent with that defense where Ravenell's blood was found in the apartment and in the car.

4. *Jury instruction on joint venture.* The defendant argues that the judge committed reversible error when he failed to instruct the jury that the defendant's concealment of Ravenell's body was insufficient to establish joint venture liability, particularly where the judge denied the defendant's request for an instruction distinguishing accessory after the fact from joint venture.[11] There was no error.

When reviewing a judge's charge to the jury, we "view[] the charge in its entirety since the adequacy of the instruction must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Galford*, 413 Mass. 364, 372 (1992), cert. denied, 506 U.S. 1065 (1993), quoting *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980). Here, the judge's instruction on joint venture made it clear that the defendant could not be found guilty of murder if her only participation consisted of helping to dispose of Ravenell's body.

Before he addressed joint venture, the judge instructed the jury that the defendant was charged in two indictments with murder in the first degree, defining murder as the "unlawful killing of a human being with malice" and that the Commonwealth had to prove each element of murder beyond a reasonable doubt. Thus it was clear that the Commonwealth had to prove that the defendant was involved in the killings, not merely covering up their deaths. The judge also stated, more than once, that the first determination

[11]Where the defendant denied that she knew anything about the child's death, the defendant does not make an argument, nor could she, that she merely participated in disposing of the child's body.

the jury had to make was whether the defendant was guilty of murder, stating that their verdicts on the murder charges had to be unanimous. He stated that only then would they determine whether she was guilty as a principal or joint venturer. Indeed, the verdict sheet was organized in this way and the judge specifically drew the jury's attention to the verdict form.[12]

When he specifically addressed joint venture, the judge instructed the jury that the defendant "wish[ed] to bring about and [sought] . . . by [her] actions to make [the murder] succeed." He also stated, more than once, that presence at the scene of the crime was insufficient to support a joint venture conviction. He stated that the Commonwealth also had to prove that the defendant shared the intent to commit the crime and that the defendant "aided or assisted *in the commission of the crime* or stood by willingly and able to help with the crime if it became necessary" (emphasis added).[13] He concluded his instruction on joint venture by stating that there "must be proof that the defendant intentionally *participated in committing that particular crime*" (emphasis added). The instruction was proper. Taken together, these instructions, along with the structure of the verdict slip, made clear that the convictions could be based only on the defendant's participation in the actual murders.

---

[12]By way of illustration, we set out an excerpt of the verdict slip:

"In the above-entitled case, we the jury say that the defendant is:

"1. _____NOT GUILTY

"2. _____GUILTY OF MURDER IN THE FIRST DEGREE

"Based on the theory:

"a. _____By Deliberate Premeditation with Malice Aforethought

"Acting as:        _____Principal
                               And/Or
                   _____Joint Venturer . . . ."

[13]The judge explained assistance as follows: "Such assistance may be provided in any of several ways. It may take the form of participating with another person in the physical acts which make up the crime, or it may take the form of obtaining or encouraging the other person to commit the crime. Such assistance may also involve agreeing to stand by the scene of the crime, to act as a lookout, or to render aid or assistance in committing the crime or in escaping if such help becomes necessary."

The defendant claims that, pursuant to *Commonwealth* v. *Ortiz*, 424 Mass. 853, 859 (1997), a judge's instruction to the jury on joint venture must include an explanation that the act of concealing a crime is inadequate to establish joint venture liability.[14] The circumstance that the court was addressing in the *Ortiz* case, which is the focus of the defendant's argument, is where a defendant claims to know that a crime is planned but maintains that she did not "aid, assist, or encourage it." *Id.* Where there is such knowledge, the court stated, an instruction should be given that "simple knowledge that a crime *will be committed* [is insufficient] even if evidence of such *knowledge* is supplemented by evidence of subsequent concealment of the completed crime" (emphasis added). *Id.* We conclude that omission of the phrase "even if evidence of such *knowledge* is supplemented by evidence of subsequent concealment of the completed crime" was not error, because the defendant did not claim to know that the murders were going to take place. See *id.* at 858 (under joint venture theory, judge need charge jury on defendant's presence only if it has legal significance). Moreover, although the judge did not mention concealing a body, he stated:

> "Presence alone does not establish a joint venture. Even if a person knew about the intended crime in advance and took no steps to prevent it, our law does not allow for guilt by association. There must be proof that the defendant *intentionally participated in committing that particular crime*, not just that she was there or knew about it. If the defendant agreed with another to commit the crime, and did nothing more, that alone does not make her part of a joint venture. Some active participation in or furtherance of the criminal enterprise is also required . . . ."

See *Commonwealth* v. *Sherry*, 386 Mass. 682, 696-697 (1982)

---

[14]The language on which the defendant relies is as follows: "[I]f a defendant is present at the crime's commission, but denies participation, or knows that a crime is planned but does not aid, assist or encourage it, the jury should be instructed that mere presence coupled with the failure to take affirmative steps to prevent the crime is insufficient, as is simple knowledge that a crime will be committed even if evidence of such knowledge is supplemented by evidence of subsequent concealment of the completed crime." *Commonwealth* v. *Ortiz*, 424 Mass. 853, 859 (1997), citing *Commonwealth* v. *Raposo*, 413 Mass. 182, 185 (1992).

(judge not constrained to use specific words in jury instructions where full and accurate explanation of law provided).

Our conclusion that the instructions were clear on this point is supported by the questions the jurors sent to the judge during their deliberations. They asked the judge twice to define principal. They also asked (1) whether someone was a principal if they held a victim down while another person beat them and the beating caused the death; (2) whether a joint venturer who was physically present during the killing but did nothing to prevent actions she knows will cause death is a principal; (3) whether direct evidence is needed to prove someone was a principal or if circumstantial evidence was sufficient. The judge answered the first question by reinstructing the jury on the definition of principal. He answered the second question in the negative and the third that circumstantial evidence was sufficient.

We also reject the defendant's argument that the judge abused his discretion in refusing, over the defendant's objection, to instruct the jury distinguishing accessory after the fact from joint venture. The judge could have concluded that charging the jury on a crime with which the defendant was not charged could serve to mislead or confuse the jury. See *Commonwealth v. Stokes*, 440 Mass. 741, 750 (2004) (supplemental jury instructions within discretion of judge). See also *Commonwealth v. Fuller*, 421 Mass. 400, 411 (1995) (court will not require specific instruction where it could confuse jury). In addition, as the court stated in *Commonwealth v. Therrien*, 371 Mass. 203, 206 (1976) ("any references to the defendant's theory of the case [i.e., accessory after the fact] must steer clear of the shoal of intimating that the jury must accept that theory in order to acquit [her]").[15] In any event, in his closing argument defense counsel argued that if they listened carefully to the judge's

---

[15]The defendant makes no argument that accessory after the fact is a lesser included offense of murder in the first degree acting as a joint venturer. See *Schmuck v. United States*, 489 U.S. 705, 715-716 & n.8 (1989) (setting forth elements test to determine whether entitled to lesser included offense charge). Instead, she relies on several Federal and out-of-State cases to argue that she was entitled to an accessory after the fact instruction as of right. We need not belabor this argument, because even if it is true that a defendant is entitled to a requested instruction on his theory of the defense, where a judge refuses to give such an instruction, it is reversible error only if the requested instruction was substantially correct; was not substantively covered in the jury charge;

instruction on joint venture, they would realize that the defendant could not be guilty of murder if her only role was helping Beneche after the fact.

5. *Review under G. L. c. 278, § 33E.* Although the defendant does not raise a claim seeking relief pursuant to G. L. c. 278, § 33E, we are obligated nonetheless to review the entire record. Having done so, we discern no basis to order a new trial or reduce the verdicts.

*Judgments affirmed.*

and concerns an important issue such that the failure to give the instruction seriously impaired the defendant's ability to present a given defense. *United States* v. *Gibson*, 726 F.2d 869, 874 (1st Cir.), cert. denied, 466 U.S. 960 (1984), quoting *United States* v. *Grissom*, 645 F.2d 461, 464 (5th Cir. 1981). Here, the defense was that Beneche did the killings. The defendant argues that accessory after the fact was not substantially covered in the jury charge but does not explain how, even if true, it seriously impaired her right to present her defense. The defendant was allowed to argue that Beneche did the killings and that the evidence against the defendant was consistent with her innocence (concerning the child) or with being coerced by Beneche to dispose of Ravenell's body, as well as to distinguish joint venture from accessory after the fact. See generally *Commonwealth* v. *Rosa*, 422 Mass. 18, 22-23 (1996) (defendant allowed to offer evidence of third-party culprit and to argue it as theory of defense). This fact, coupled with our conclusion that the jury instructions and the structure of the verdict slip made clear that the defendant could not be convicted as a joint venturer unless the jury found that she was guilty of murder, supports our conclusion that there was no error.

Moreover, whether a defendant is even entitled to an instruction on a crime with which she was not charged is not settled law. See generally *United States* v. *Rivera-Figueroa*, 149 F.3d 1, 7 (1st Cir.), cert. denied sub nom. *Rodriguez-Rodriguez* v. *United States*, 525 U.S. 910 (1998). In the *Rivera-Figueroa* case, the court discussed Federal cases addressing a request for an accessory after the fact instruction where it was offered as a kind of defense. It referred to *United States* v. *Brown*, 33 F.3d 1002, 1003-1004 (8th Cir. 1994), and that court's solution to instructing on accessory after the fact, as follows: "The Eighth Circuit's approach appears to us liable to mislead the jury. A charge normally tells the jury that each element of the charged offense must be proved. To give the jury an additional set of elements for an uncharged crime that is not a lesser included offense, and of which the defendant seemingly cannot be convicted, seems to us a recipe for confusion. Where appropriate, the court can properly explain to the jury the defendant's theory of the case is that he merely assisted in covering up the crime but did not participate in its commission." *United States* v. *Rivera-Figueroa, supra.*