# United States Court of Appeals
## For the First Circuit

No. 07-1962

UNITED STATES OF AMERICA,

Appellee,

v.

ANGEL A. MELENDEZ-RIVAS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Lipez, Circuit Judges.

Rafael F. Castro Lang for appellant.
Nelson Pérez-Sosa, Assistant United States Attorney, with
whom Rosa Emilia Rodriguez-Velez, United States Attorney, was on
brief for appellee.

May 15, 2009

**LYNCH**, **Chief Judge**.  In a crime apparently motivated by jealousy over a woman, the woman's suitor, Kelvin Ramos, was taken from his motorcycle in a Puerto Rican housing project, forced into a van by a group of assailants, including defendant, and murdered by the father of her children.  The murderer was killed, perhaps by Ramos's friends, before any federal charges were brought.

The defendant here, Angel Melendez-Rivas, maintained his innocence on the stand and said he was forced to participate in the crime.  He was convicted of conspiracy and of aiding and abetting a motor vehicle hijacking with intent to cause death, as well as of a firearms offense during and in relation to the crime.  Three other co-defendants were also charged, but the indictments against them were dismissed without prejudice, at the government's request, on the eve of trial.  Melendez-Rivas, who had no prior criminal record, was sentenced to 50 years' imprisonment, after the government declined to seek the death penalty.

Melendez-Rivas appeals, primarily arguing that the evidence was insufficient to meet the elements of the offenses of conviction and that he is entitled to an acquittal.  We disagree.  Defendant's second argument is that the intervention of the trial court in questioning a defense witness went beyond the appropriate limits and put prejudicial, inadmissible hearsay before the jury, to his detriment.  We are sufficiently concerned about the possible interference with defendant's fair trial rights engendered by the

-2-

particular questions and answers that we vacate the conviction and remand for a new trial.

I.

## Appeal From Denial of Rule 29 Motion

We first address the defendant's argument that the evidence was insufficient. If defendant is correct, then the case ends and he may not be tried again. See Smith v. Massachusetts, 543 U.S. 462, 467 (2005) ("[T]he Double Jeopardy Clause of the Fifth Amendment prohibits reexamination of a court-decreed acquittal to the same extent it prohibits reexamination of an acquittal by jury verdict."). "For purposes of assessing the sufficiency claim, we recite the facts in the light most favorable to the verdict." United States v. Upton, 559 F.3d 3, 6 (1st Cir. 2009).

A.      Factual background

On the evening of June 16, 2005, Kelvin Ramos drove his Hyabusa Suzuki motorcycle to the Quintana Housing Project, where his girlfriend Taishanet Falu lived. He wore a red shirt, short, black pants, and jewelry, including a bracelet watch and distinctive gold chain. The chain was a thick "Cuban-type" chain with two panthers and the letter "K" on it. While visiting Taishanet, Kelvin received a phone call and went to leave. Taishanet also left her home and went over to visit her sister

-3-

GinLin Falu Garcia and her cousin Glenda Falu Rivera, both of whom also lived at the Quintana Project.

As Kelvin got on his motorcycle, three men surrounded him. At trial, Taishanet identified them as Edwin, Taishanet's estranged husband and the father of her children, Johal, a known associate of Edwin, and Melendez-Rivas. Edwin held a gun up to Kelvin's face on one side of the motorcycle, while Johal stood on the other side of the motorcycle, and Melendez-Rivas stood behind Johal. Taishanet yelled at Edwin and begged him not to harm Kelvin, at which point Edwin said to her: "Don't you get up close here, because I will hit you with the gun, you little bitch." Johal grabbed Taishanet while Edwin confronted Kelvin and told him to pull up his shirt. Kelvin pulled out his gun from under his shirt and gave it to Edwin, who handed the gun to Melendez-Rivas. Taishanet continued to beg Edwin not to hurt Kelvin. Kelvin told her he would be fine and asked her to leave.

Soon after, "Bondy," co-defendant Luis Nieves-Burgos, arrived in a white and gray van.[1] Bondy got out of the van as Edwin and Melendez-Rivas struggled with Kelvin to get him off the

---

[1] The government's theory of the events of June 16 differs substantially from the defendant's account of the events that evening, as we discuss later in more detail. The government theorized based on Taishanet's testimony that Bondy drove the van to the scene of the kidnapping, that Johal drove the van away, and that the defendant was already there with Edwin and Johal before the van arrived. The defendant testified that he drove the van to and from the scene, an account consistent with the testimony of one government eyewitness.

-4-

motorcycle and into the back of the van. Edwin and Melendez-Rivas forced Kelvin into the van, which Johal then drove away.

Shortly afterward, "Jonty," co-defendant John T. Ayala, arrived with "Pupen," co-defendant José Luis Cora-Meléndez. They tried to start the motorcycle but were unable to ride it. Later, Guillermo Rodriguez arrived and drove the motorcycle away.

Taishanet then returned to her house with her sister, who contacted Kelvin's wife, Irysa García-Reyes to let her know what had happened to Kelvin and that she thought he had been killed. Taishanet tried to call Kelvin's cell phone several times; once, Edwin picked up, and when Taishanet told him not to harm Kelvin, Edwin started laughing.

Taishanet testified that later that evening, she saw Edwin and Melendez-Rivas in the project. She saw that Edwin was wearing Kelvin's jewelry. Edwin said to her, "I gave him 30 because he is a pig."

Kelvin's body was found two days later with thirty-two gunshot wounds. There was no physical evidence other than the jewelry linking the death to the defendant. The government's argument at trial was that the defendant's presence at the scene where Kelvin was forced off his motorcycle and the fact that Edwin handed Melendez-Rivas Kelvin's gun proved intent to aid and abet.

B.        Sufficiency challenge

Defendant's argument that the district court erred in denying his motion for acquittal is based on a misapprehension of the elements of the statutory offense; it is also foreclosed by circuit precedent.  Our review is de novo both because we are reviewing evidentiary sufficiency and because we are interpreting the terms of a statute.  United States v. Teleguz, 492 F.3d 80, 86 (1st Cir. 2007) ("Our review of legal questions is de novo, and we review the entire record on [the defendant's] sufficiency claim.").

If a reasonable factfinder could have found the defendant guilty beyond a reasonable doubt, we must affirm.  United States v. Lipscomb, 539 F.3d 31, 40 (1st Cir. 2008) ("Viewing the evidence in the light most flattering to the jury's guilty verdict, we assess whether a reasonable factfinder could have concluded that the defendant was guilty beyond a reasonable doubt.").

Here, the jury answered a special verdict that "the taking of the motorcycle occur[red] with the intent to cause death or serious bodily injury [to Kelvin Ramos]" and that "[t]he intent or motive behind the killing of [Ramos] was . . . jealousy."

Melendez-Rivas argues from this second finding.  He says the relevant motive which separates the federal crime from a state crime is the motive for the ultimate killing (not the taking of the vehicle), and since the motive for the killing found by the jury here was jealousy, no federal crime was committed.

He is wrong.  Not only does the specific language of the statute say otherwise but our case law has already rejected this argument.

The statute reads:

> Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempt to do so, shall . . . (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

18 U.S.C § 2119(3) (emphasis added).

The requisite intent was that first found by the jury: that at the time the victim's motorcycle was taken, it was done with the intent to cause death or serious bodily injury.  The relevant intent may be conditional -- that is, the intent requirement is satisfied if at the time Melendez-Rivas took control of the motorcycle, he had an intent to kill or cause serious bodily injury to the driver, whether or not the intent was necessary to take the vehicle.  Holloway v. United States, 526 U.S. 1, 12 (1999) ("The intent requirement of § 2119 is satisfied when the Government proves that at the moment the defendant demanded or took control over the driver's [vehicle] the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the [vehicle] (or, alternatively, if unnecessary to steal the [vehicle]).").  The statute does not require that the taking of the motor vehicle be "an

-7-

ultimate motive for the crime." United States v. Rivera-Figueroa, 149 F.3d 1, 4 (1st Cir. 1998). Rather, "[i]t is enough that the defendant be aware that the action in which he is engaged, whether by himself or through direction or assistance to another, involves the taking of a motor vehicle." Id.

More recently, in United States v. García-Álvarez, 541 F.3d 8 (1st Cir. 2008), this court rejected an argument similar to defendant's. Defendant there argued that he took the victim's car solely for use as a getaway vehicle and that the taking of the car was never the motive for the crime. García-Álvarez affirmed the Rivera-Figueroa holding that the taking of a vehicle need not be the ultimate motive for the crime under § 2119(3). Id. at 6.

Based on the evidence here, Melendez-Rivas had to be aware that he was involved in the taking of a motor vehicle, and that Ramos had already started the motorcycle when Melendez-Rivas and his co-defendants surrounded him. They had to take control of the motorcycle in order to subdue Ramos. In doing so, they pointed a gun at the victim, showing an intent to cause death or serious injury, an intent reinforced by what happened next. The evidence, viewed in the light most favorable to the government, was sufficient.

We affirm the denial of his motion for judgment of acquittal.

Questioning by the District Court and Answers Elicited

Two separate strands of legal doctrine are combined in defendant's second challenge. He first argues that certain questions, which were asked by the trial judge, elicited answers that were inadmissible and prejudicial because the responses erroneously suggested to the jury that Melendez-Rivas was involved in other crimes not charged in the instant indictment.

Secondly, defendant argues, the prejudicial effect on defendant was made worse by the fact that it was the trial judge who asked the questions sua sponte and then refused to give any curative instruction. In reviewing the district court's questioning, our "inquiry . . . necessarily turns on the question of whether the complaining party can show serious prejudice." Loque v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997).

A. Conflicting testimony presented at trial

We set the stage. The evidence presented was largely testimonial, and the witnesses' accounts often conflicted. The jury faced credibility contests on several central issues in the case.[2] First, Melendez-Rivas testified that he was driving the van home,

---

[2]     Indeed, at closing argument, the prosecution emphasized the inconsistencies and credibility contests in the case, characterizing the defendant's account as too "convenient" to be believed, and insisting that Taishanet could not have simply "ma[d]e . . . up" her account.

when he arrived at a spot in the street where he was blocked by the kidnappers who were confronting Kelvin. He further testified that he only became involved in driving the getaway van because he had been threatened by Edwin and Johal, who carried loaded guns when they demanded he become involved and drive the van. He feared he would be killed if he did not participate. He said he did not force Kelvin into the van. Finally, he also testified that he had no prior criminal record and was not friendly with the other men accused of kidnapping Kelvin. The crime was motivated by Edwin's jealousy, the defendant claimed, and he carried no grudge against Kelvin and had no reason to be involved in killing him. We describe the testimony in more detail below.

The prosecution anticipated and countered defendant's themes with Taishanet's testimony, which was the primary evidence presented against the defendant at trial.[3] Taishanet's testimony painted a picture of voluntary participation by the defendant. Taishanet placed the defendant as already at the basketball court with Edwin and Johal: she testified that the three of them

---

[3]     Defendant also argues that the prosecution engaged in improper vouching during its questioning of Taishanet and that the district court erred in admitting her testimony that the FBI had instructed her to tell the truth. The defendant did not object on this basis in the district court, and therefore our review is for plain error. There was no error in this regard, let alone plain error.

confronted Kelvin and forced him off his motorcycle.[4]  Indeed, the defendant took the gun from Edwin when Edwin disarmed Kelvin.  This was the strongest evidence at trial contradicting defendant's claim of coercion.

Taishanet testified that Bondy, not Melendez-Rivas, then arrived in a white van and that it was Edwin, Johal, and the defendant who forced Kelvin into the van.  She stated that Bondy got out of the truck, that Edwin and Melendez-Rivas forced Kelvin into the back of the van, and that Johal (not defendant) then got into the van and drove it away.  Further, she testified that later that evening, she saw Edwin, accompanied by Melendez-Rivas, and that Edwin (and not Melendez-Rivas) was wearing Kelvin's jewelry.  The defendant, by contrast, claimed he did not see Edwin and Johal until the next day.

To attack Taishanet's credibility, defense counsel on cross-examination elicited testimony from Taishanet that she never reported Kelvin's kidnapping to the police, that she had received $2600 for her testimony, and that she associated with several notorious local criminals and had never reported their criminal activities.

One of the prosecution's two other eyewitnesses, GinLin, arrived on the scene after the altercation had already begun and so

---

[4]    Although witnesses and the government described Kelvin as Taishanet's boyfriend, she denied having a romantic relationship with him and stated that they were just friends.

could not address whether defendant initially had been forced to participate. Her testimony confirmed only that Melendez-Rivas had driven the van away, a point Melendez-Rivas admitted, but that conflicted with Taishanet's testimony that Johal had driven the getaway vehicle. She further testified that Edwin and Johal (and not Melendez-Rivas) dragged Kelvin into the van, which was consistent with Melendez-Rivas's testimony. She also said that later that evening, she saw the defendant (rather than Edwin, as Taishanet had testified) wearing Kelvin's "K" necklace, and that he was standing with Edwin and Johal.

The prosecution's third eyewitness, Glenda, whose credibility was under heavy attack at trial, testified she saw Edwin point a gun at Kelvin to force him off the motorcycle and that Johal and the defendant were there. She testified that she then ran upstairs into her aunt's house. Her testimony did not address whether defendant was participating voluntarily. She testified that she then ran out onto the balcony and saw Edwin put Kelvin into the van. She stated that Melendez-Rivas got into the front passenger door of the van before it drove away. She did not see who drove the van away. She testified that she later saw Edwin, but that she could not identify who he was with.

Glenda admitted that she initially told the FBI agents that she only saw Edwin and Johal on June 16, and that after being shown a picture of Melendez-Rivas she told the agents that she had

-12-

not seen him. Cross-examination further elicited that two FBI agents had approached Glenda three months later and told her that they believed that Melendez-Rivas was involved and that she had committed a very serious crime by not giving them the information they wanted. Only after that did she say that she had seen the defendant on the evening of June 16.

The prosecution presented additional evidence in an effort to refute Melendez-Rivas's defense theories in several ways. It tried to establish that: (1) Melendez-Rivas was friends with members of the group which had accosted Kelvin (thus making it improbable that he was forced into participating); (2) Melendez-Rivas had admitted this connection to FBI agents who investigated the crime in the project; and (3) Melendez-Rivas had Kelvin's distinctive jewelry, a Cuban-type chain with two panthers containing a letter. Despite the difference between "A" and "K," the prosecution's theory was that defendant's "A" necklace was the same "K" necklace that originally belonged to Kelvin, and that defendant, prior to Kelvin's murder, had worn a simpler gold chain. Melendez-Rivas denied the first two and put on evidence (including from his wife and two jewelers who claimed to have made the necklace) of his prior ownership of the similar Cuban-type "A" chain.

During the defense case, Melendez-Rivas testified that although he was driving the white van, he was coerced into becoming involved in the altercation between Kelvin and Edwin, Johal, and

-13-

Pupen. Defendant testified that he was driving from the project basketball court when he stopped the van near where the others were already confronting Kelvin on his motorcycle. Defendant stated that at that time, he saw Taishanet, GinLin, and Glenda in the street. At that point, defendant testified, Edwin and Johal had a gun on Kelvin and they forced Kelvin into the rear of the van. Edwin then went to the front passenger door and "told me to take off." Melendez-Rivas said he obeyed because Edwin "had two weapons and I understood that if I didn't take off, they were going to kill me." He testified that Edwin and Johal let him out of the van once they left the housing project with Kelvin, he walked to his mother's house, which was also in the project, and Edwin and Johal drove the van away with Kelvin still alive inside. Although Taishanet and GinLin testified they saw defendant that evening in the project with Edwin,[5] defendant said he did not see Edwin and Johal until the next day, when they came by to threaten defendant not to tell anything to the police.

Melendez-Rivas further testified that he had no prior record and he did not "hang with" the conspirators. He said that although he knew Kelvin as an acquaintance from vocational school, he had carried no grudge against Kelvin and had never been in a

_____

[5] GinLin testified to having seen Edwin, Johal, and defendant, while Taishanet testified she saw only Edwin and defendant. Glenda saw Edwin that evening, but she testified that she could not identify who was with Edwin.

-14-

fight with him.  He also stated that he was afraid to go to the police because he was afraid of Edwin and Johal because they ran the drug point at the Quintana project.

B.          Questioning by the district court

The district court's questioning, challenged by the defendant, occurred during the re-cross-examination of a defense witness and police officer, Victor Rivera Martinez, who was Melendez-Rivas's father-in-law.[6]  On re-direct, Rivera stated that he was familiar with the neighborhood, that he knew of no close relationship between Melendez-Rivas and Edwin and Johal, and that this was despite the fact that Edwin and Johal were notorious figures at the Quintana project.

Before beginning re-cross-examination, the prosecutor requested a bench conference where she stated that, in order to undermine the defense's lack of connection theory, she wanted to ask Rivera about whether he knew that defendant had admitted to the FBI that he was in the van with Edwin and Johal on the evening of June 16.  This statement was the subject of a pending suppression motion.[7]  The district court determined that it would not allow

---

[6]     When Rivera took the stand, the defendant had not yet testified.

[7]     The court completed the suppression hearing later in the trial, at defense counsel's request.  The court determined that defendant's statements to the FBI during two separate interviews were voluntary admissions, that the statements to the FBI only confirmed what was already in the record, and that not only was the information admissible, "some of it [was] even exculpatory, up to

questions directly about the statements to the FBI, but that the prosecution could ask about rumors regarding connections between Melendez-Rivas and the kidnappers on the evening of the kidnapping.

On re-cross-examination, the prosecution, trying to undermine the defense's lack of connection theory, asked Rivera about whether he had heard that the defendant, Edwin, and Johal had taken Kelvin outside the project on the night of June 16. A bench conference ensued over the questioning, the court directed the prosecution to ask about rumors.

The prosecution then asked whether Rivera had heard rumors as to what had happened to Kelvin on June 16. Rivera answered "yes, that's right." The district court then asked "what have you heard?" Rivera stated that he had heard a rumor "[t]hat Mr. Cora, Edwin and Johal took [Kelvin] out [of] the housing project." Defendant was not mentioned. The prosecution then asked whether Rivera had heard that it was Melendez-Rivas who took Kelvin out of the project. Rivera responded "Never" and proceeded to deny hearing about any connection between the defendant and the men who had kidnapped Kelvin.

At that point the district court intervened and asked questions, apparently meant to refer back to the prosecution's suggestion that defendant had earlier admitted his connection to

---

a certain point, in favor of [defendant]."

other kidnappers to the FBI agents. The questioning went as follows:

> The Court: Did the FBI ever interview you about the facts of this case?
>
> Rivera: They made a comment to me one time when they came by the front of my house.
>
> The Court: And can I ask you what the comment was?
>
> Rivera: They went to the house of a neighbor, and when I am coming to my house, one of the agents comes up to me and says to me that my son-in-law was involved in a series of felony crimes that could lead to the death penalty.
>
> Defense Counsel: I have an objection at this time.
>
> The Court: That is what they told you? That is what they told you?
>
> Rivera: That is correct.
>
> Defense Counsel: I have an objection and a motion.
>
> The Court: You can make your motion. Please approach.
>
> The Court: And, of course, you did not believe that?
>
> Rivera: No, never in my life.

A bench conference ensued. The defense objected and immediately moved for a mistrial on the grounds that "[Rivera] has now said that the FBI told him that there were a series of felonies that could lead to the death penalty. That has been introduced. There is nothing to that." The court responded, "You heard what I said, 'and

-17-

you did not believe that?' And he said, 'No.'" Defense counsel responded, "But the FBI said it." The court then overruled defense counsel's objection and denied his motion for a mistrial.[8]

The court also denied a subsequent written motion for reconsideration of the defendant's motion for a mistrial, which elaborated on defense counsel's objections to the testimony. In the memorandum accompanying the motion, defense counsel made three central arguments regarding the judge's interjection into the cross-examination of Rivera. First, defense counsel argued that the judge's question called for a hearsay answer and that the answer elicited was hearsay. Second, defense counsel stated that the departure from the district court's otherwise neutral conduct during the trial posed particular risks:

> The Court has more credibility than either party before a jury. The manner in which this was done would reasonably make it seem to a juror that the Court is imparting information to them that it wants them especially to have because of its importance.

Finally, defense counsel explained the prejudicial effect on defendant's trial strategy: "A crucial element for the defense . . . was to highlight the fact that the defendant had no prior involvement with the criminal justice system, and was therefore an

_____

[8] Following the suppression hearing the next day on the admissibility of defendant's statements to the FBI, the prosecution recalled Rivera to ask only whether it would surprise him to learn that the defendant had admitted to the FBI that he was with Edwin and Johal in the van on the evening of June 16 and that defendant had "hung out" with them. Rivera said it would surprise him.

-18-

unlikely person to have been chosen to engage in the conduct of which he stands accused," and that as a result of the district court's question, "the average juror will [receive] the impression that the Court has doubts about a key element of the defense." In what defense counsel described as "a close case on the evidence [where] [t]here is no overwhelming proof of guilt," any such influence by the district court must affect the jury's verdict.

In the same written motion, defense counsel requested, in the alternative, a curative instruction as follows:

> You are instructed that a judge may ask questions during a case. However, on occasion a judge may ask a question that is not proper and which you should not consider. This happened in this case. This Court asked a question of the witness, Police Officer Victor Rivera[,] which brought about an answer that is improper for you to consider. Therefore, you are instructed to strike from your minds the question asked by the Court and the response of the witness. It would be a violation of your oath as jurors to consider that question and the response to it.

The district court denied the motion altogether, including the requested instruction.

C.      The district court's denial of the motions for a mistrial and curative instruction

We consider the court's questions, the elicited answers, the refusal to give any curative instructions, and what impact they may have had.

1.    Judge's power to question witnesses

The prosecution argues that the court did nothing more than to exercise its power under Fed. R. Evid. 614(b) to interrogate witnesses.  It is well-established that judges are free to ask questions to elicit facts to facilitate a "clear presentation of the issues."  United States v. Rosario-Peralta, 199 F.3d 552, 560 (1st Cir. 1999).  Nonetheless, the judge's right to ask questions should be "exercised with care," Logue, 103 F.3d at 1045, particularly when doing so may affect the rights of a criminal defendant.  The need for restraint is related to the need for a judge to "be balanced; he cannot become an advocate or otherwise use his judicial powers to advantage or disadvantage a party unfairly."  Id.

There is particular concern when it is the judge's questioning which brings in evidence which is both inadmissible and prejudicial hearsay.  4 J.B. Weinstein & M.A. Berger, Weinstein's Federal Evidence § 614.04[1][b], at 614-15 (J.M. McLaughlin ed., 2d ed. 2006) ("There is . . . the danger that the judge may elicit from the witness responses hurtful to the accused, and to which the jury may assign peculiar weight because of their ostensible judicial sponsorship.").  Defendant argues that in a close case, the risk is particularly acute: the judge's interjection suggested that the court might have additional information about defendant's guilt, and cast serious doubt on Melendez-Rivas's central defenses.

The prosecution contends the court was only seeking clarity to assist the jury.[9]  See Rodriguez v. Banco Cent. Corp., 990 F.2d 7, 12 (1st Cir. 1993).  Although the prosecution did not create the problem, it is held accountable for it.

The mere crossing of the line by a diligent trial judge will not itself lead to reversal.  United States v. Paiva, 892 F.2d 148, 159 (1st Cir. 1989).  In evaluating whether defendant has shown sufficient prejudice, we consider all the factors in the case.  If this case were solely to rest on a claim that the court's questioning evidenced partiality to the prosecution, we would deny relief.  Cf. Deary v. City of Gloucester, 9 F.3d 191, 194-95 (1st Cir. 1993) (rejecting allegation that trial judge was so biased as to deprive defendant of a fair trial).  A different type of prejudice is at issue here, as we explain below.

2.    Introduction of inadmissible and prejudicial hearsay

We conclude that defendant was seriously prejudiced. First, the question about what comments the FBI had made to the witness called for inadmissible hearsay.  The witness's answer was not only inadmissible, but was very harmful to the defendant: the FBI agent purportedly stated "that [Melendez-Rivas] was involved in

---

[9]    The problem is not one of the judge's questioning interfering with the jury's proper role.  See United States v. Ofray-Campos, 534 F.3d 1, 18 (1st Cir. 2008).  Nor is the problem really one of the judge becoming a witness.  See Quercia v. United States, 289 U.S. 466, 470 (1933).

-21-

a series of felony crimes that could lead to the death penalty." The jury could easily have understood this to be a representation that Melendez-Rivas was involved in other serious crimes, crimes so serious as to raise the prospect of the death penalty. That was simply untrue. Second, this certainly undercut the defendant's testimony that he had no criminal record or charges against him and did not associate with two notorious criminals in the project.

Further, the jurors could have perceived the question as enhancing the prosecution's effort to impeach a defense witness. See 4 Weinstein & Berger, supra, § 614.04[4][b], at 614-27 (suggesting that the trial court ought not conduct questioning that resembles a cross-examination challenging the credibility of a witness).

Over counsel's objection, the court did not strike the answer and tell the jury to disregard it. Instead, the court asked again whether that is what the FBI agents had told the witness. The witness answered, "That is correct." This repetition, made within earshot of the jurors, reinforced the prejudicial effect.

Counsel objected again. Before counsel could approach the bench, the court, perhaps realizing the potential prejudice to defendant, may have attempted to ameliorate the problem by asking if the witness believed the FBI, and then repeated that the witness disbelieved what the FBI agents had said. We cannot say with confidence this ameliorated the harm. In addition, this then

-22-

created an issue for the jury of whether the defendant's father-in-law or the FBI was lying.  There was never any curative instruction given.  The prejudice was not offset by the judge's preliminary instructions at the start of trial.  Those instructions were that "nothing that I may say or nothing that I may do is intended to indicate, nor should [it] be taken by you as indicating, what your verdict should be," and that the jury "should never be influenced by any ruling that I make or for the reasons behind the ruling."

These instructions are mismatches to the problem at hand.[10]  Nor were instructions given which were closer to a match.

The totality of the record shows that the judge's questions elicited inadmissible, prejudicial testimony.  The testimony was not stricken, nor was a curative instruction given.  The inadmissible evidence contradicted one of defendant's central

_____

[10]    There was, for example, no instruction that the jury should not assume the court had any view on the subject of the court's questions and that the jury could disregard all the court's questions.  4 Weinstein & Berger, supra, § 614.04[4][c], at 614-28.1 to -28.2 ("The risk that a judge's questioning conveys a message regarding a defendant's guilt may be reduced by instructing the jurors that they should not assume that the judge holds any opinion on the subject of the court's questions and that the jury may disregard all the court's comments in arriving at its findings of fact."); see also Rivera-Torres v. Ortiz Velez, 341 F.3d 86, 100 (1st Cir. 2003) ("[A]ny possible risk of prejudice to [defendant] as a result of the judge's questions was abated by the clear instruction to the jury that it should ignore any impression that his questions might have had on them."  (alterations in original) (quoting United States v. Henry, 136 F.3d 12, 19 (1st Cir. 1998))); United States v. Candelaria-Silva, 166 F.3d 19, 36 (1st Cir. 1999) (strong jury instructions sufficient to eliminate any potential prejudice stemming from judge's "facial expressions" or other signs of frustration exhibited in contentious trial).

defenses and cast doubt on the credibility of his coercion defense. We cannot say this error was harmless.

III.

We <u>vacate</u> and <u>remand</u> to the district court for a new trial.