UNITED STATES of America,
Plaintiff(s),

v.

Paolo ROSARIO[1] and Alejandro
Martinez Martinez[2],
Defendant(s).

Criminal No. 12–662(DRD).

United States District Court,
D. Puerto Rico.

Signed April 30, 2014.

146

Kelley L. Tiffany, San Juan, PR, for Plaintiff(s).

Carmen Coral Rodriguez–Morales, Hector E. Guzman–Silva, Federal Public Defender's Office, Hato Rey, PR, for Defendant(s).

**OMNIBUS OPINION AND ORDER**

DANIEL R. DOMÍNGUEZ, District Judge.

Pending before the Court are: (a) *Motion for Acquittal under Rule 29(c) of the Federal Rules of Criminal Procedure,* filed by defendant Alejandro Martínez Martínez ("Martínez"), Docket No. 93; (b) *Joint Motion for Acquittal Pursuant to Rule 29 and Motion to Dismiss for Lack of Jurisdiction,* filed by defendant Paolo Rosario ("Rosario"), Docket No. 94; (c) *Joint Motion Submitting,* filed by defendants Martínez and Rosario, Docket No. 95, and (d) *United States' Motion in Opposition to Defendants' Motions for Acquittal under Rule 29,* Docket No. 96. For the reasons set forth below, the defendants' motions for acquittal are denied.

**Factual and Procedural Background**

On or about August 16, 2012, at "approximately 32 nautical miles south of Cabo Rojo, Puerto Rico traveling towards the coast of Puerto Rico," the United States Coast Guard's ("USCG") "Sensor Operators of aircraft CG2308 observed what appeared to be a small fishing vessel ("suspect vessel")," and "observed [its] occupants jettison four bales appearing to be contraband into the water." *See* Docket

No. 96, page 1. The Sensors Operators notified the USCG command center of the suspect vessel's location, and continued to monitor the suspect vessel as it "changed course and began to travel west back towards the Dominican Republic." *Id.* The USCG notified the United States Customs and Border Protection Caribbean Air and Marine Branch ("CAMB") who deployed a law enforcement vessel to recover the abandoned bales." *Id.* Meanwhile the Sensors Operators continued the visual surveillance of the suspect vessel until it was intercepted by the USCG's Cutter Cushing "approximately 37 nautical miles south of Mona Island at approximately 7:30 P.M." *Id.* at page 2. Thereafter, USCG personnel onboard the Cutter Cushing boarded the suspect vessel and conducted a Right of Visit questioning to the master/person in charge of the suspect vessel, specifically as to the registration and nationality of the vessel. *Id.* "The master responded that he was in the process of registering the vessel in the Dominican Republic." *Id.* Nowhere in the vessel were indicators of the vessel nationality. *Id.* Thereafter, the USCG contacted the authorities of the Dominican Republic who informed the USCG personnel that "there was no registration record for the vessel in the Dominican Republic for the [suspect] vessel in the Dominican Republic." *Id.* "As such, the suspect vessel was treated as a vessel without nationality and the two occupants of the vessel, who were identified as the defendants, Paolo Rosario and Alejandro Martínez, were transported to San Juan, Puerto Rico for further investigation and processing." *Id.*

The two count Indictment was filed on September 7, 2012 against defendants Paolo Rosario [1], and Alejandro Martínez [2], for possession with the intent to distribute five kilograms or more of a cocaine mixture, "that is approximately 76 kilograms (gross weight), a Schedule II, Narcotic Drug Controlled Substance, on board a vessel subject to the jurisdiction of the United States, that is: a vessel without nationality," all in violation of 46 U.S.C. §§ 70503(a)(1), 70504(b)(1), and 70506(a); and, for "knowingly and intentionally import into the United States from a place outside thereof, five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine," all in violation of 21 U.S.C. §§ 952, 960, 963.

A jury trial was held from July 15–24, 2013, that is, six days. The jury verdict was returned on July 24, 2013, *see* Docket entries No. 85 and 86. The defendants renewed their motions for acquittal after the defendants rested their case, however, the Court denied the acquittal request. *See Minutes* of July 24, 2013, Docket No. 82.

Defendants Rosario and Martínez filed their post-conviction motions for acquittal on September 11, 2013, *see* Docket entries No. 93, 94. The defendants' joint exhibits were filed on September 12, 2013, *see* Docket No. 95. The Government filed its response on September 23, 2013, *see* Docket No. 96. Mr. Rosario's sentencing hearing is set for April 30, 2014 at 9:30 a.m., and Mr. Martínez' sentencing hearing is set for May 6, 2014 at 9:00 a.m. *See* Docket entries No. 103 and 105.

**Applicable Law and Discussion**

A. **Motion for acquittal under Rule 29(c) of the Federal Rules of Criminal Procedure.**

"A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Rule 29(c) of the Federal Rules of Criminal Procedure ("Fed.R.Crim.P.").

"Rule 29 of the Federal Rules of Criminal Procedure provides that a court

may acquit a defendant after the close of the prosecution's case if the evidence is insufficient to sustain a conviction." *United States v. Alfonzo–Reyes*, 592 F.3d 280, 289 (1st Cir.2010). "[T]he tribunal must discern whether, after assaying all the evidence in the light most flattering to the government, and taking all reasonable inferences in its favor, a rational fact finder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." *United States v. Hernández*, 146 F.3d 30, 32 (1st Cir.1998)(citing *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir.1994)); *see United States v. Marin*, 523 F.3d 24, 27 (1st Cir.2008); *United States v. García–Carrasquillo*, 483 F.3d 124, 129–30 (1st Cir. 2007); *United States v. Boulerice*, 325 F.3d 75, 79 (1st Cir.2003); *United States v. Walters*, 904 F.2d 765, 770 (1st Cir.1990); *United States v. Serrano*, 870 F.2d 1, 5 (1st Cir.1989).

 In analyzing a Rule 29 motion, "[v]iewing the evidence in the light most flattering to the jury's guilty verdict, [the Court must] assess whether a reasonable factfinder could have concluded that the defendant was guilty beyond a reasonable doubt." *United States v. Lipscomb*, 539 F.3d 32, 40 (1st Cir.2008). Thus, "the jurisprudence of Rule 29 requires that a deciding court defer credibility determinations to the jury." *Hernández*, 146 F.3d at 32 (citing *O'Brien*, 14 F.3d at 706); *United States v. Walker*, 665 F.3d 212, 224 (1st Cir.2011) ("we take the facts and all reasonable inferences therefrom in the light most agreeable to the jury's verdict."); *United States v. Muñoz–Franco*, 487 F.3d 25, 41 (1st Cir.2007). Additionally, the Court "must be satisfied that 'the guilty verdict finds support in a plausible rendition of the record.'" *United States v. Pelletier*, 666 F.3d 1, 12 (1st Cir.2011)(quoting *United States v. Hatch*,

434 F.3d 1, 4 (1st Cir.2006)). This standard is a "formidable" one, especially as "[t]he government need not present evidence that precludes every reasonable hypothesis inconsistent with guilt in order to sustain a conviction." *United States v. Loder*, 23 F.3d 586, 589–90 (1st Cir.1994) (internal quotation marks omitted). Moreover, there is no "special premium on direct evidence." *O'Brien*, 14 F.3d at 706. "[T]he prosecution may satisfy its burden of proof by direct evidence, circumstantial evidence or any combination of the two." *Id.* (citing *United States v. Echeverri*, 982 F.2d 675, 677 (1st Cir.1993)). Expressed in alternate fashion, "no premium is placed on direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction." *United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir.1992). As to evidentiary conflicts, "the trial judge must resolve all evidentiary conflicts and credibility questions in the prosecution's favor; and moreover, as among competing inferences, two or more of which are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt." *United States v. Olbres*, 61 F.3d 967, 970 (1st Cir.1995); *see Hernández*, 146 F.3d at 32 (the trial court is required to "consider all the evidence, direct and circumstantial, and resolve all evidentiary conflicts in favor of the verdict.") (citing *United States v. Carroll*, 105 F.3d 740, 742 (1st Cir.1997)). On the other hand, "[t]he court must reject only those evidentiary interpretations that are unreasonable, unsupportable, or only speculative and must uphold any verdict that is supported by a plausible rendition of the record." *United States v. Ofray–Campos*, 534 F.3d 1, 31–32 (1st Cir.2008); *see also United States v. Cruzado–Laureano*, 404 F.3d 470, 480 (1st Cir.2005) (urging the trial court "not to believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty ver-

dict finds support in a plausible rendition of the record.") (citing *United States v. Gómez*, 255 F.3d 31, 35 (1st Cir.2001)).

The United States Court of Appeals for the First Circuit ("First Circuit") reiterated the above general standard in *United States v. Meléndez–Rivas*, 566 F.3d 41 (1st Cir.2009) (citing *Lipscomb*, 539 F.3d at 40), holding that the sufficiency standard for a Motion for Acquittal under Rule 29 required the district court to determine whether, viewing the evidence in the light most favorable to the government, a reasonable fact finder could have concluded that the defendant was guilty beyond a reasonable doubt. The Court, therefore, is not to discard compliance with the requirement of the standard of "guilty beyond a reasonable doubt." However, a defendant challenging his conviction for insufficiency of the evidence faces an "uphill battle." *United States v. Hernández*, 218 F.3d 58, 64 (1st Cir.2000). Nevertheless, "despite the prosecution-friendly overtones of the standard of review, appellate oversight of sufficiency challenges is not an empty ritual." *United States v. de la Cruz–Paulino*, 61 F.3d 986, 999 n. 11 (1st Cir.1995).

In the instant case, both defendants moved the Court to be acquitted *albeit* on different grounds. Defendant Martínez moved to be acquitted on two grounds, to wit: (a) lack of jurisdiction under the Maritime Drug Law Enforcement Act ("MDLEA"), and (b) insufficiency of the evidence as to the possession of the of controlled substances. Mr. Martínez further alleges that "[t]he government did not present sufficient facts to support the existence of the Conspiracy for which he was found guilty of." *See* Docket No. 93, page 3. "Nor is there sufficient evidence that Mr. Martínez–Martínez ever engaged in the conduct required to prove that he actually committed the offenses for which he was convicted." *Id.* Defendant Rosario, however, moved to be acquitted only on the ground of lack of jurisdiction as the "evidence is not sufficient to convict and to confer jurisdiction over the conspiracy to import controlled substances charge." *See* Docket No. 94, page 11. Moreover, "[t]he evidence presented at trial showed that the interdiction events occurred far away from the coast of Cabo Rojo, actually more than 30 nautical miles away." *Id.*

The Government filed its opposition on September 23, 2013 rejecting the defendants' arguments. *See* Docket No. 96. Generally, the Government alleges that the evidence presented at trial was sufficient to prove beyond reasonable all counts of the Indictment. As to defendant Rosario's argument, the Government argues that jurisdiction is not a requirement under 21 U.S.C. §§ 952 and 963. Defendant Martínez, however, centered his argument on the insufficiency of the evidence, which warrants his acquittal. The Court is not persuaded by the defendants' arguments and briefly explains.

## B. *The Maritime Drug Law Enforcement Act v. Jurisdiction.*

The Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. § 70501 *et seq.*, was enacted by Congress in response to the "trafficking in controlled substances aboard vessels" which has become "a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501. In *United States v. Angulo–Hernandez, et al.*, 565 F.3d 2, 4 (1st Cir.2009), the Court held:

Congress intended the MDLEA to address this "specific threat to the security and societal well-being of the United States," *id.*, by providing for the enforcement of our drug laws outside the

territorial jurisdiction of the United States to include, inter alia, vessels "registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States." *Id.* § 70502(c)(1)(C).

In *United States v. Nueci–Peña,* 711 F.3d 191, 197 (1st Cir.2013), the Court held:

> The MDLEA makes it unlawful for an individual to "knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance on board ... a vessel of the United States or a vessel subject to the jurisdiction of the United States." 46 U.S.C. § 70503(a)(1). That prohibition "applies even though the act is committed outside the territorial jurisdiction of the United States." Id. § 70503(b). A vessel "subject to the jurisdiction of the United States" includes "a vessel without nationality." *Id.* § 70502(c)(1)(A). "A vessel without nationality" in turn is defined, as relevant here, as "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." *Id.* § 70502(d)(1)(C). [FN6]. The MDLEA does not require a nexus between a defendant's conduct and the United States. *See id.* § 70502(c).
>
> > [FN6.] Section 70502(e) defines "a claim of nationality or registry" as including only: "(1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas; (2) flying its nation's ensign or flag; or (3) a verbal claim of nationality or registry by the master or individual in charge of the vessel."

In *United States v. Matos–Luchi, et al.,* 627 F.3d 1, 4 (1st Cir.2010), the defendants challenged the jurisdiction of the Court under the MDLEA leading to a conviction of defendants' possession of the cocaine with the intent to distribute on board "a vessel subject to the jurisdiction of the United States," 46 U.S.C. § 70503(a)(1). The Court made a thorough analysis of the MDLEA, and the Coast Guard Authorization Act of 1996, which amended the MDLEA, and held:

> Congress' intent to reach broadly was reconfirmed in the Coast Guard Authorization Act of 1996, Pub. L. No. 104–324, § 1138, 110 Stat. 3901, 3988–89, which amended the MDLEA by providing that the "jurisdiction" of the United States over a vessel under the MDLEA was "not an element of the offense" but a matter to be determined "solely by the trial judge," *id.* § 1138(a)(5) (now codified at 46 U.S.C. § 70504(a)), and that a defendant had no standing to claim that enforcement violated "international law"-reserving such objections only to foreign nations, *id.* § 1138(a)(4) (now codified at 46 U.S.C. § 70505).[FN4]
>
> > [FN4.] "Jurisdiction" in this context refers to the enforcement reach of the statute-not federal court subject-matter jurisdiction, which extends to any federal felony. *United States v. González,* 311 F.3d 440, 443 (1st Cir.2002), *cert. denied,* 540 U.S. 826, 124 S.Ct. 47, 157 L.Ed.2d 49 (2003). That reach was limited by Congress to minimize conflict with foreign nations who might also assert rights to regulate. *See United States v. Vilches–Navarrete,* 523 F.3d 1, 22 (1st Cir.) (separate opinion of Lynch & Howard, JJ.), *cert. denied,* 555 U.S. 897, 129 S.Ct. 208, 172 L.Ed.2d 168 (2008).
> >
> > . . .

Under international law, every vessel must sail under the flag of one and only one state; those that sail under no flag or more than one flag enjoy no legal protection. 1 L. Oppenheim, *International Law* § 261, at 595–96 (H. Lauterpacht ed., 8th ed.1955); *see also Convention on the High Seas* art. 6, Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82; *United States v. Victoria*, 876 F.2d 1009, 1010–11 (1st Cir.1989). By custom, a vessel claims nationality by flying the flag of the nation with which it is affiliated or carrying papers showing it to be registered with that nation. 1 Oppenheim, *supra*, §§ 260–261, at 594–96. Without a flag or papers, a vessel may also traditionally make an oral claim of nationality when a proper demand is made-a pattern the MDLEA follows.

. . .

The controlling question is whether at the point at which the authorities confront the vessel, it bears the insignia or papers of a national vessel or its master is prepared to make an affirmative and sustainable claim of nationality. To read the MDLEA more restrictively would mean that the master and crew need only carry no papers and jump overboard to avoid having their vessel classed as stateless. *Cf. González*, 311 F.3d at 449 (Torruella, J., concurring in the judgment).

. . .

The defendants are not entitled to raise a violation of international law as an objection, *see* 46 U.S.C. § 70505, but in any case the MDLEA does not conflict with international law. For international law too treats the "stateless vessel" concept as informed by the need for effective enforcement. Thus, a vessel may be deemed "stateless," and subject to the enforcement jurisdiction of any nation on the scene, if it fails to display or carry insignia of nationality and seeks to avoid national identification. This occurs if a "ship" repeatedly refuses, without reasonable excuse, to reveal its allocation [of nationality]. If no registration number is visible and no other indicator [of nationality] can be discerned, the cognoscibility is already demonstrably insufficient, and interference will then often be justifiable. . . . From the basic design of [the law of sea] and from the place the institution here called allocation occupies in it already it may be concluded that a "ship" which obscures the cognoscibility of its allocation repeatedly, deliberately, and successfully may be treated as stateless.

H. Meyers, *The Nationality of Ships* 322 (1967)(footnote omitted).

In sum, the instances specified by Congress—pertinently, the refusal "aboard" the vessel to claim nationality, 46 U.S.C. § 70502(d)(1)(B)—are not departures from international law but merely part of a pattern consistent with it; and when Congress used the word "includes" in listing specific instances, it allowed for reasonable extrapolation to functionally similar instances—including a refusal by the crew to claim nationality that happens to occur aboard a cutter which has the subject "vessel" in tow.

*Id.* at pages 5–7.

In the instant case the factual background is similar to the facts set forth in *Matos–Luchi*, 627 F.3d 1. In our case, defendants Rosario and Martínez, responded to the USCG's inquiry, that "he [the master] was in the process of registering the vessel [ALICANTINO] in the Dominican Republic." *See* Docket No. 96, page 2. "No other indicators of nationality appeared on the vessel." *Id.* "Accordingly, Coast Guard personnel approached Dominican Republic authorities and requested confirmation of the suspect vessel's regis-

try to which they were informed that there was no registration record for the vessel in the Dominican Republic." *Id.* Hence, the USCG proceeded to treat the vessel ALICANTINO "as a vessel without nationality" and defendants Rosario and Martínez were arrested and transported to San Juan, Puerto Rico for further interrogation, investigation and processing. *Id.* Reference is made to the defendants' *Joint Motion Submitting,* Docket No. 95, and Exhibits No. 95–1 and 95–2, the certification issued by the Dominican Republic War Marine on August 16, 2012, wherein the Dominican Republic Management of Ports Command stated: "By means of this letter we want to make known that there is no vessel by the name of *"ALICANTINO"* listed on the archives registry system belonging to this Ports Command Management, W.M. The present document is issued upon request of the interested party, in the Municipality of Santo Domingo East, on the 16th day of the month of August, of year 2012." The Certification is signed by Mario Alberto De Jesús Reynoso, Vessel Captain, DEMN, Ports Command Director, War Marine. *Id.* The defendants' joint motion also included a copy of the USCG's report, *see* Docket No. 95–3 and 95–4.

 Defendant Rosario alleges that "[f]or the United States to have jurisdiction over a vessel in the high seas, and over the occupants, the government must prove that the vessel is a vessel without nationality." *See* Docket No. 94 at page 5. The Court disagrees, as jurisdiction is not an element of 21 U.S.C. §§ 952, 960, 963. As held by the Court in *Matos–Luchi,* 627 F.3d at 4, "the 'jurisdiction' of the United States over a vessel under the MDLEA was 'not an element of the offense' but a matter to be determined 'solely by the trial judge,' *id.* § 1138(a)(5) (now codified at 46 U.S.C. § 70504(a)), and that a defendant

had no standing to claim that enforcement violated 'international law'-reserving such objections only to foreign nations, *id.* § 1138(a)(4) (now codified at 46 U.S.C. § 70505)." Hence, the Court finds that the defendants are impaired to challenge a violation to international law under the MDLEA with the sole purpose to dismiss an indictment or to warrant an acquittal. *See Matos–Luchi,* 627 F.3d at 6:

> The controlling question is whether at the point at which the authorities confront the vessel, it bears the insignia or papers of a national vessel or its master is prepared to make an affirmative and sustainable claim of nationality. To read the MDLEA more restrictively would mean that the master and crew need only carry no papers and jump overboard to avoid having their vessel classed as stateless. *Cf. González,* 311 F.3d at 449 (Torruella, J., concurring in the judgment).

The Court further finds, based on the evidence presented, that the USCG complied with due diligence at the time of the interdiction with the vessel ALICANTINO, as provided by the MDLEA, and declaring the ALICANTINO as a vessel without nationality based on the information provided by the defendants while on board the suspect vessel, and by the authorities of the Dominican Republic. General and bare allegations, as well as arguments devoid of any supporting evidence are insufficient to warrant an acquittal of the defendants.

### C. Sufficiency of Evidence.

 Defendants challenge the sufficiency of the evidence presented by the Government with regards to Counts One and Two of the Indictment. When a defendant challenges his conviction on sufficiency of evidence grounds, the Court must consider all facts in the light most

favorable to the prosecution and make all reasonable inferences in the Government's favor. *United States v. García–Carrasquillo*, 483 F.3d 124, 129–30 (1st Cir.2007); *United States v. Boulerice*, 325 F.3d 75, 79 (1st Cir.2003); *United States v. Walters*, 904 F.2d 765, 770 (1st Cir.1990); *United States v. Serrano*, 870 F.2d 1, 5 (1st Cir. 1989). The Court will uphold a guilty verdict if "a rational factfinder could conclude that the prosecution proved all elements of the crime beyond a reasonable doubt." *See García–Carrasquillo*, 483 F.3d at 129–30. During its inquiry, the Court shall "neither weigh the credibility of the witnesses nor attempt to assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant's innocence." *United States v. Munoz–Franco*, 487 F.3d 25, 41 (1st Cir.2007) (internal citations and quotations omitted).

On July 24, 2013, both defendants, Rosario and Martínez, were found guilty as charged by the jury on both counts, to wit: (a) Count One, "a conspiracy as to possession with the intent to distribute [more than 5KG] cocaine aboard a vessel subject to the jurisdiction of the United States;" and, (b) Count Two, "a conspiracy to import [more than 5KG] cocaine from a place outside the United States to the United States." *See* Docket entries No. 85, 86.

Defendants allege that the Government failed to present any evidence to show that the suspect vessel is a vessel without nationality, and challenged the validity of the Certification provided by the authorities of the Dominican Republic. However, the defendants failed to present evidence to show otherwise, that is, a valid certification of the registry of the vessel ALICANTINO; the flag, identification number of the vessel, marks or any other evidence to show that the evidence submitted by the USCG is either fraudulent or insufficient.

Defendants' insufficiency of the evidence argument is twofold. First, the defendants aver that their conspiracy conviction must be overturned, as the evidence presented at trial was contradictory and insufficient to support a finding, beyond a reasonable doubt, that the defendants were part of the conspiracy or indeed have one. Second, the defendant Martínez also posits that his conviction is based on the "deficiencies in the government's [which are] not limited to the absence of evidence relating to Martínez–Martínez supposed criminal intent." *See* Docket No. 93 at page 3. "The government did not present sufficient facts to support the existence of the Conspiracy for which he was found guilty of." *Id.* "Nor is there sufficient evidence that Mr. Martínez–Martínez ever engaged in the conduct required to prove that he actually committed the offenses for which he was convicted." *Id.*

Defendant Martínez further alleges that he found out during trial that the Government introduced evidence as to an alleged "confession" made by defendant Rosario, evidence of which was never provided to defendant Martínez prior to trial. *See* Docket No. 93 at pages 4–9. Lastly, defendant Martínez alleges that the conviction on both counts must be vacated, arguing that no reasonable juror could find that he possessed cocaine with the intent to distribute. For the foregoing reasons, the Court finds Defendants' arguments to be unavailing and summarily denies both motions for acquittal. *See* Docket entries No. 93, 94.

The Government, however, argues that "the evidence offered at trial sufficiently supported both defendants' convictions beyond a reasonable doubt." *See* Docket No. 96 at page 12–18. As to the evidence presented by the USCG, the Government

alleges: [1]

First, the Co–Pilot, Lieutenant (LT) Luke Zitzman and Sensor Operator Aviation Electronic Technician First Class (AET1) Dillon Herbert onboard the Coast Guard fixed-wing aircraft both testified that the suspect vessel, approximately 19 feet in length, light blue in color with one outboard engine, was traveling on an easterly course towards the island of Puerto Rico between the Dominican Republic and Puerto Rico, in a suspicious area for a vessel of that size. Both testified that they did not see any other vessels within a 40 nautical mile (NM) radius of the suspect vessel either on the radar or visually. Both indicated that they personally observed the individuals onboard the suspect vessel jettison at least four packages into the water upon detection of the aircraft. Both witnesses identified that one of the individuals onboard the suspect vessel wore a white baseball hat and the other wore a green shirt—facts corroborated by the photographic exhibits submitted by the United States taken by AET1 Herbert using a forward looking infrared camera (FLIR). Additionally, AET1 Herbert, a highly skilled sensor operator who testified that he could differentiate an object as large as a whale to as small as a cooler from a boat on the radar, pointed out a package floating directly in the wake of the suspect vessel which he observed thrown from the vessel by the individual wearing the green shirt, later identified as Alejandro Martinez.

This Court heard testimony that both aircraft crew members marked the position of the jettisoned bales on the aircraft's Global Positioning System (GPS) unit and informed other Law Enforcement personnel responding to the narcotics crime of that location and then maintained constant aerial surveillance of the suspect vessel and the defendants, never losing sight of them, until the suspect vessel eventually became dead in the water and the CGC Cushing took positive control.

We further learned that upon interdiction by the CGC Cushing, the Commanding Officer, Lieutenant Commander (LCDR) Glen Goetchius, observed the suspect vessel and described it as a single outboard engine, 19 ft yola, light blue in color with two people onboard, one wearing a white baseball hat and the other wearing a green shirt. Further, Coast Guard video taken from the deck of the CGC Cushing at the time of the interdiction and offered into evidence by the United States further corroborated LCDR Goetchius' testimony as it clearly depicted two individuals, one wearing a white baseball hat and the other wearing a green shirt, onboard a light blue yola with one outboard engine—the same description testified to by the aircraft crew who maintained constant surveillance of the suspect vessel and the two individuals after they were observed jettisoning suspicious packages overboard.

This Honorable Court also heard testimony that the CGC Cushing handed over the boarding to the boarding team from the CGC Campbell which included the Boarding Officer, Maritime Enforcement Specialist First Class (ME1) Stephen Villerot, a witness who testified on behalf of the United States and who positively identified the defendants and indicated that at the time of the boarding, defendant Paulo Rosario was the individual wearing the white hat and that defendant Alejandro Martinez was

---

**1.** The Court decided to incorporate the Government's summary of the evidence presented on the record, as well as the applicable legal arguments, to avoid being repetitious.

the individual wearing the green short sleeved shirt. He also informed the Court that he did not observe any fishing gear onboard the suspect vessel. This Honorable Court also heard that a Customs and Border Protection (CBP) helicopter and Marine unit from the Caribbean Air and Marine Branch (CAMB) assisted with the recovery of the items jettisoned by the defendants. Agent Torres from CAMB indicated that while en route to find the bales at the location, he did not observe any other vessel in the area. Additionally, Agent Linares from CAMB corroborated the fact that no other vessels were in the area as he too indicated that he did not observe any vessels anywhere close to the location where the bales were jettisoned or subsequently retrieved.

The United States introduced testimony that the bales floated in the water for roughly an hour before they were retrieved by the CBP Marine interdiction unit at a location roughly one nautical mile away from the location marked by the CG fixed wing aircraft and that during that time from when they were jettisoned until they were recovered, they had drifted roughly one nautical mile, a distance consistent with the anticipated drift rate to be expected of a package located in that area of the ocean during that amount of time as indicated by LCDR Goetchius.

This Honorable Court learned that the CBP unit transferred the retrieved bales ashore, turned them over to agents from the DEA who weighed them and that the weight was approximately 76 kilograms, an amount greater than what an individual would personally consume. The stipulation of the parties further proved that the items were in fact cocaine with a net weight of 66.63 kilograms (excluding the packaging). Furthermore, all of the Law Enforcement witnesses involved in the interdiction testified that they have never been involved in a maritime drug trafficking venture where there was only one person onboard the vessel. In its argument, the undersigned indicated that the jury could reasonably infer that maritime drug trafficking ventures demand multiple trusted participants to ensure the delivery of the narcotics to the destination and to assist with the transportation of the same—especially in cases such as this where the street value for one kilogram in the district of Puerto Rico is approximately $25,000 (as testified to by SA Torres, DEA).

Lastly, this Court heard testimony from Special Agent Torres that Defendant Rosario made incriminating statements that supported the inference that he knew the packages contained cocaine and that he entered into an agreement with others to transport the cocaine for purposes of distributing it.

Due to the fact however, that Defendant Rosario has not raised any issues regarding the sufficiency of the evidence surrounding the elements of knowledge and possession with the intent to distribute, the undersigned will address the sufficiency of the evidence regarding these factors specifically in response to the arguments raised in Defendant Martinez's Motion at ECF # 93.

First off, the undersigned recognizes that a defendant's mere presence at the scene of the crime alone is generally insufficient proof of his participation in the crime. *United States v. Guerrero*, 114 F.3d 332, 342 (1st Cir.1997). The evidence presented by the United States however, strongly shows beyond a reasonable doubt that the defendant knew about the drugs given the fact that he was literally sitting on top of them as testified to by AET1 Herbert and that

the was the one that attempted to destroy the packages by throwing them overboard. Although the United States did not present voice recordings or text messages evidencing Defendant Martinez's state of mind or intent to enter into an agreement, the circumstantial evidence overwhelmingly established that his presence onboard the yola was not due to mere happenstance but rather because he had voluntarily joined the conspiracy.

Courts have constituently upheld similar convictions where the evidence was circumstantial in nature. *See* for example, *United States v. Robinson–Munoz*, 961 F.2d 300 (1st Cir.1992) habeas corpus denied 819 F.Supp. 1136 (D.P.R.1993), dismissal of post-conviction relief *affirmed* 81 F.3d 147 (1st Cir.1996) (defendant had knowledge that boat was transporting marijuana; 114 bales of marijuana were in plain view on 35–foot boat, crew members' clothing, food, and cooking equipment were found on top of and adjacent to bales, branches had been placed on sides of boat to make it appear that crew members were fishing, and no fishing gear was found on board). *United States v. Santana–Rosa*, 132 F.3d 860 (1st Cir.1998), (there was sufficient circumstantial evidence that defendants were persons on vessel *who dumped cocaine into ocean to* support their convictions of possessing cocaine with intent to distribute, where four people were witnessed running from vessel into mangroves, defendants were arrested in mangroves, no others were encountered in area, there was testimony that area was remote and uninhabited, and agent aided by infrared night vision system opined that defendants were ones who fled vessel); *United States v. Romero*, 32 F.3d 641 (1st Cir.1994) (there was sufficient evidence that defendants had been in possession

of bales of cocaine that Coast Guard recovered from ocean to support their convictions for possessing, while aboard vessel subject to jurisdiction of the United States, cocaine intended for distribution, in light of testimony that defendants were seen throwing bales from their vessel into water, that same bales were present in courtroom, that defendants' vessel attempted to evade surveillance aircraft, that vessel was of type commonly used for drug smuggling, that vessel's cargo area had been washed down with gasoline, apparently to eliminate traces of controlled substance, that bales of cocaine were discovered within expected area, and that no other boats were in area); *United States v. Victoria*, 876 F.2d 1009 (1st Cir.1989) (notwithstanding defendant's contention that he was "merely present" on vessel and therefore did not possess marijuana with intent to distribute in that he was electrician brought on vessel in morning to help with repairs and was prevented from leaving by crew member with gun, evidence was sufficient to support defendant's conviction for knowingly possessing marijuana with intent to distribute it; given obvious presence of many bales of marijuana, jury could have found that crew would not have brought anyone, even electrician, on board unless he knew about, and was helping with, enterprise); *United States v. Sandoval*, 787 F.Supp. 275 (D.Puerto Rico 1992), (evidence, although circumstantial, was sufficient to allow jury to find that defendants knowingly and intentionally possessed cocaine with intent to distribute, even though they claimed that they were merely present on vessel transporting cocaine; very small vessel on extended voyage was carrying large amount of contraband, defendants' explanation for their voyage was not credi-

ble, voyage commenced in known drug-source country, vessel changed course after its first encounter with coast guard, and there was evidence from which jury could infer that crew members on vessel had responsibility to retrieve cocaine from its hiding places and to facilitate its distribution).

Accordingly, Defendant Martinez's claim that the United States failed to present evidence that he ever acted with the requisite intent to commit any of the offenses for which he was convicted lack merit as ample evidence exists on the record in support that he knowingly entered into an agreement to possess with the intent to distribute cocaine and to import cocaine into the United States from outside thereof.

■ As to defendant Martínez' allegation regarding a violation by the Government for failure to disclose the alleged "confession" of defendant Rosario prior to the trial, the United States vehemently denied Martínez' allegations, both under *Brady* and *Bruton*. *See* Docket No. 96 at pages 18–21. "The government submits that any potential prejudice pursuant to *Bruton* was easily remedied by the redaction during SA Torres' testimony of any express reference to Defendant Martínez and that this redaction effectively protected the defendant's sixth amendment right to confrontation." *Id.* at page 20. The government further emphasized that "at no point did the contents of the Defendant Rosario's statement, as dictated to the members of the jury by SA Torres, implicate Defendant Martínez." *Id.* at page 21. The Government further argues:

> Yet, Counsel for defendant seems to ignore the testimony of all the other witnesses, the photographic and video evidence and the contraband introduced at trial in order to argue that the only evidence the government had against his client was Defendant Rosario's confession coupled with the fact that his client was with him on the boat thereby making him guilty solely by association. This argument lacks merit, assumes that all of the jurors in this case lacked the ability to reasonably consider all the evidence and follow the instructions of the court and seriously misstates the facts of the case.

> Lastly, this Honorable Court specifically instructed the jury not to associate or assign any degree of culpability towards Defendant Martinez as a result of Defendant Rosario's statement, thereby curing any spillover that Defendant Martinez argues occurred.

*Id.*

The Court notes that during trial, the parties filed a motion entitled *United States' and Defendants' Joint Motion Informing the Court of a Stipulation of Fact,* Docket No. 80, wherein the defendants stipulated: (a) "the narcotics seized in association with the instant offense [Counts One and Two] tested positive for cocaine hydrochloride;" (b) "the gross weight of the narcotics seized ... was 78.32 kilograms;" (c) "the net weight of the narcotics seized ... was 66.63 kilograms;" (d) "the narcotics seized ... tested positive for cocaine hydrochloride was 74.1% pure." The defendants, however, did not stipulate the possession of the controlled substances and/or narcotics, and opted to proceed to trial.

### A Final Note

■ Finally, "if the verdict is 'supported by a plausible rendition of the record,'" the Court must uphold the verdict. *See United States v. Bobadilla–Pagán,* 747 F.3d 26, 32 (1st Cir. (Puerto Rico), 2014).

### Conclusion

In view of the foregoing, the Court finds that the defendants have been unable to

show that there is sufficient evidence on the record to warrant the acquittal requested.

Hence, the defendants' motions for acquittal, Docket entries No. 93, 94, are denied.

The Court will proceed with the sentencing hearings of the defendants as follows:

Defendant Alejandro Martínez Martínez' sentencing hearing is set for April 30, 2014 at 9:30 a.m.

Defendant Paolo Rosario's sentencing hearing is set for May 6, 2014 at 9:00 a.m.

IT IS SO ORDERED.